**UNITED STATES of America, Appellee,**

v.

**Hyman Harvey KLEIN, Maurice Haas, and Morris O. Alprin, Defendants-Appellants.**

No. 374, Docket 23905.

United States Court of Appeals
Second Circuit.

Argued May 15, 1957.

Decided Sept. 3, 1957.

See, also, United States v. Klein, D.C.S.D.N.Y., 124 F.Supp. 476, 18 F.R.D. 439, 131 F.Supp. 807, 139 F.Supp. 135, and United States v. Haas, D.C.S.D.N.Y., 126 F.Supp. 817.

---

Theodore Kiendl, of Davis, Polk, Wardwell, Sunderland & Kiendl, New York City (William R. Meagher, John A. Reed, and Philip C. Potter, Jr., of Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, on the brief), for defendant-appellant Hyman Harvey Klein.

Louis Bender, New York City, for defendant-appellant Maurice Haas.

F. Joseph Donohue and Abraham S. Goldstein, Washington, D. C. (Michael Kaminsky, New York City, and Harold Ungar, Washington, D. C., on the brief), for defendant-appellant Morris O. Alprin.

Maurice N. Nessen and Joseph De-Franco, Asst. U. S. Attys., S. D. N. Y., New York City (Paul W. Williams, U. S. Atty., New York City, on the brief), for appellee.

Before CLARK, Chief Judge, and SWAN and POPE, Circuit Judges.

CLARK, Chief Judge.

This appeal presents issues of income tax evasion arising out of extensive and involved transactions disclosed to a jury in a trial of almost five months' duration. The prosecution was difficult because the case arose out of concealed business affairs of both great magnitude and unusual complexity. This is indicated by the fact that defendants had organized no less than seventeen foreign corporations to carry on their business operations and, according to the Government's claim, to hide income and evade taxes. Representing the defendants were able and resourceful counsel who succeeded in procuring directed judgments of acquittal on the charges of specific tax evasions; and the trial had to proceed in somewhat dismembered form until a verdict was reached on a single separate count charging conspiracy to obstruct the Treasury Department in its collection of the revenue. Defendants have continuously attacked this count for a variety of reasons, generally centering on the point that it is too vague and general to afford a proper basis for a felony trial and conviction. The emphasis on this point is so strong that, as will appear, this appeal largely turns upon issues of federal criminal pleading.

The count upon which conviction was had is often termed "Fifth," since it appeared as such, though in slightly different form, in the original indictment. Of the other four original counts, three charged substantive evasions of Klein's income taxes, while the fourth charged conspiracy to evade the taxes of Klein and associates. On these counts acquittal was directed by the trial court, as stated in United States v. Klein, D.C.S. D.N.Y., 139 F.Supp. 135. Earlier there had been pretrial attacks on the indictment and particularly on the Fifth Count. Though these were unsuccessful, United States v. Klein, D.C.S.D.N.Y., 124 F. Supp. 476, the Government was moved to procure a superseding indictment on September 17, 1954, of which the Second Count took the place of the original Fifth Count. Originally indicted were nine persons, including the three present appellants, three Canadian residents who were never apprehended, a seventh defendant who died before trial, and two remaining defendants named only in the first four counts and freed when these counts ended in the acquittal judgments. After those judgments were entered on June 28, 1955, the trial, which had started on April 4, 1955, proceeded on the Fifth Count (in its superseded form) until the three appellants were convicted

by the jury on August 22, 1955. The judgments entered on this verdict provided for substantial penalties of imprisonment and fine, the heaviest being assessed against Klein, the principal defendant.

We shall proceed to a statement of the facts as the jury could find them in deciding for conviction.

1. *The Persons Involved.* The crucial Fifth Count named seven defendants and two coconspirators. H. H. Klein was the principal defendant, a United States citizen, whose alleged evasion of immense amounts of income tax due in 1944, 1945, and 1946 was the crux of the first four counts in the indictment. He made tremendous amounts of money during the period when OPA was in effect in this country by manufacturing and selling "Harwood's," a brand of whiskey manufactured in Canada by himself and the three nonappearing Canadian residents —Isidor J. Klein, Albert McLennan, and George Norgan. Three lesser defendants were Morris O. Alprin, Maurice Haas, and Ellis Rosenberg, attorneys who served H. H. Klein in distributing Harwood's in this country. Rosenberg, Klein's most intimate lawyer, died before trial. Alprin, a personal friend of Klein's, gave legal advice and performed various odd chores. Haas, who is primarily an accountant, gave legal advice and did some accounting. Irving A. Koerner, named as a coconspirator, but not a defendant, in the Fifth Count, was the manager of the New York City wholesale division of R. C. Williams & Co., which imported Harwood's into the United States. Albert Roer, not named as either a coconspirator or defendant in the Fifth Count, was very active in selling Harwood's in this country and was in the same firm as Koerner at one time. William Rokoff, a coconspirator, was H. H. Klein's personal secretary and ran Klein's office in Baltimore. Harry Silver, the remaining coconspirator, played no significant part in the case. Thus the present appellants are H. H. Klein, one of the four owners of the enterprise; Maurice Haas, his accountant; and Morris O. Alprin, his attorney.

2. *The Background Events.* Prior to the start of the conspiracy H. H. Klein and the three Canadians employed the other named persons to assist them in running an immense whiskey selling business in a fashion calculated to minimize the amount of United States income tax they would have to pay. The whiskey was manufactured in Canada by a Canadian corporation and was billed f.o.b. Canada, so that title did not pass in the United States. The Canadian manufacturing corporation did not bill the whiskey direct to R. C. Williams & Co. in this country; Agencias, a Cuban corporation controlled by Klein and the three Canadians, was inserted in the chain of title, though the whiskey itself was sent directly from Canada to the customers in the United States designated by Williams.

During the very profitable years, 1944–1946, the intercorporate manipulation and complexity were carried to a great length to obtain tax advantages. The basic theory of the prosecution's first four counts was that these corporations were sham and that Klein and his three associates were actually doing business as joint venturers. While the judge below eventually held that the corporations were bona fide, there was considerable doubt in the minds of Klein and his friends at the time they were selling Harwood's that the corporate entities would be respected by the United States Treasury and several legal opinions were solicited. Having thus learned that the Treasury would be more inclined to ignore the Cuban corporation device if it discovered that the corporate officers were directing operations from the United States, Klein and his associates took steps to hide such facts. There was a second secret contract between Agencias and R. C. Williams & Co., the importer; and this gave Klein considerable control over the details of merchandising in this country. Alprin, Haas, Rosenberg, and Roer all performed services for the

Harwood's syndicate in the United States; and Rokoff conducted much of the bookkeeping and billing of Agencias from Baltimore, while making it appear that the corporation operated out of Cuba. Contemplating an impending end to price controls, which were a large factor in the success of the enterprise, Klein and his companions introduced several new nonoperating foreign corporations into the intercorporate structure, arranging the bookkeeping so as to draw off the enterprise's profits into them. Among them was Tivoli Trading Co., S. A.

*3. The Conspiracy before September 18, 1951.* Since the indictment upon which the appellants were prosecuted was filed September 17, 1954, the three-year statute of limitations here applicable, 18 U.S.C. § 3282, requires proof of a conspiracy continuing after September 17, 1951. The indictment charged that the conspiracy began in June 1946, and we turn now to the events between June 1946 and September 1951. Klein, Alprin, Roer, Koerner, and Rosenberg decided to form a new batch of Cuban corporations which could be used as personal pocketbooks by key Harwood's employees who were to receive large sums upon the imminent breakup of the syndicate. The corporations were eventually formed, Rosenberg receiving one, and Koerner, Roer, and Alprin four apiece. Later Roer transferred one of his—LaRibera—to Haas.

On February 24, 1947, Klein, who then controlled Tivoli Trading Co., caused Tivoli to pay $35,000 to Haas' LaRibera corporation by check. On March 27, 1947, Klein caused Tivoli to purchase three Canadian bank drafts in large amounts. Two were identical: made out in favor of one of Alprin's Cuban corporations in the amount of $264,162.70 apiece. A third was in favor of one of Roer's corporations in the sum of $272,-423.62. Klein instructed Haas to deposit his $35,000 check in a Canadian bank, and not to use it until instructed. He delivered Roer's draft to him with similar instructions about nonuse. Klein gave Alprin the two identical drafts, explain-

ing that one was for him and one for Koerner and that Alprin should deposit his own in a Canadian bank and hold onto Koerner's.

The recipients of the drafts had many reasons for accepting payment in that fashion, but one of them was a desire which they shared with H. H. Klein to keep from the United States Treasury information which might lead it to conclude that he and the three Canadians had erroneously reported their income for the years 1944–1947. Their fear was this: If the Treasury found the drafts, they might be construed as payment for services rendered to Klein's corporations in the United States during the years 1944–1947; the Treasury might then be more inclined to disregard the corporate veil; if the corporations— which were Canadian, Cuban, and Panamanian—were disregarded, immense profits from whiskey sales were earned by Klein personally; in that event they would be taxable as ordinary income, for a United States citizen must pay tax on his earnings abroad. H. H. Klein, the benefactor and employer of these people, was in effect paying Roer, Koerner, and Alprin large sums, and Haas a lesser amount, for past services rendered, but was asking them to hold up use of the funds until his income tax liability was safely resolved.

Klein had Rokoff record the drafts in Tivoli's books as "commissions" paid by Tivoli, and the loan or gift to Haas was put in the Tivoli books the same way. This enabled Tivoli falsely to deduct the sums as business expenses. On the same day that Klein purchased the bank drafts he sold out the assets of Tivoli to Hannes & Co., another corporation wholly owned by Klein. Klein later filed his return for 1947 with the assistance of Haas, and in a rider he stated that Tivoli had large "contingent liabilities" which were assumed by Hannes.

Roer held his draft and did not deposit it until 1950. Alprin split up his draft into three parts and deposited them in three Canadian bank accounts in the names of three of his Cuban corporations.

Alprin held onto Koerner's draft, on instructions from Klein, despite Koerner's desperate efforts to obtain it. Haas deposited his check in Canada. For a while the accounts in Canada were frozen by the Canadian Government, and during the same general period H. H. Klein's long difficulties with the United States Treasury began. They started with a jeopardy assessment in March 1948 and have led in ultimate course to the present appeal. When Klein succeeded in unfreezing the Canadian accounts he instructed Alprin to put his money together again in the form of a single draft in favor of a Cuban corporation and to hold onto it until given further instructions. Later an escrow arrangement was worked out, involving Klein, Haas, Koerner, and Alprin, to appease Koerner, who still wanted his draft.

In 1949 Klein was asked some interrogatories by Treasury agents, and Haas helped him with the answers. Klein falsely stated that he was "not in a position to answer" questions about the nature and amount of funds paid over by Tivoli to certain named Cuban corporations—those controlled by Haas, Roer, and Alprin—or to identify the beneficial owners of these companies. He also claimed that all the books of account of his foreign corporations were maintained at the corporations' Cuban office, although he knew that the chief set of books had been kept by Rokoff in Baltimore.

*4. The Events between September 18, 1951, and September 17, 1954.* On November 3, 1951, Klein signed the interrogatories which he had submitted to Treasury officials in 1949, leaving his answers unchanged and swearing to the truth of what he had said. On February 29, 1952, Klein and Alprin held the telephone conversation which constitutes the first overt act in the Fifth Count of the indictment. Klein told Alprin that he could use his own draft and could release Koerner's. Klein said: "Yes, you can use your check. Get a good tax man." Alprin asked, "What do you mean?" The reply: "I can't talk on the telephone.

Rosenberg will be in to see you on Monday. Don't do anything until Monday, when Mr. Rosenberg will come to see you."

The attempt to hide the existence of the drafts came to an end the following fall when first Alprin, then Koerner and Roer, then Haas, and finally Klein told Treasury agents about the drafts. Alprin, Koerner, and Roer had a consistent story, explaining the whole transaction; Klein told a different story; Haas straddled the two versions.

*5. The Prosecution's Alternative Patterns of Facts Concerning the Nature of the Tivoli Drafts:* (a) *The Drafts as Liquidating Dividends.* The jury could have found that in 1945 before the commencement of the conspiracy H. H. Klein had invited Roer, Alprin, and Koerner to enjoy the profits of his fabulous enterprise, feeling grateful to them for their services performed in less mellow years. Accordingly they had paid him several hundred dollars for stock in Tivoli. The entire arrangement was very informal and they never received any certificates or subscription receipts. Subsequently there was some curious paper shuffling, but it was always recognized that these men were part owners of Tivoli, with their shares held in trust by Klein. When Klein delivered their drafts in 1947 it was with the explanation that Tivoli had been liquidated and that the drafts represented liquidating dividends.

The conspiracy to defraud the Treasury, under this version of facts, was carried out by Klein and Rokoff, who, in the period before September 1951, rewrote the books of Tivoli to cover up the fact that Alprin, Roer, and Koerner were shareholders and to make it appear that the drafts were commissions. As part of the plot, in 1949 Klein gave false answers to Treasury interrogatories, claiming that the original owners of Tivoli were himself and the three Canadians and that he had bought out the Canadians in 1947 for $375,000. The criminal concealment was carried into the period covered by the indictment when in 1952 Klein signed his previous interrogatories

and later reiterated his false story to Treasury agents. Rokoff in 1953 continued the concealment by being vague and evasive in an affidavit concerning his role in rewriting the Tivoli books.

(b) *The Drafts as Compensation.* The other version is this: The original plan to have Roer, Koerner, and Alprin subscribe to stock in Tivoli was not favored by Rosenberg, Klein's personal attorney. On Rosenberg's advice Klein returned the relatively small amounts paid by those three employees and explained that he was buying back their subscriptions. At this time Klein had all the stock in his name, but he was holding three-quarters of it in trust for three Canadians. Klein had promised Roer, Koerner, and Alprin that they would eventually receive a commission of a certain number of cents per case of Harwood's; and the drafts paid in 1947 represented such a commission, as these men well knew.

But on the last day before the period covered by the indictment, September 17, 1951, Roer filed a false personal income tax return claiming that he sold 1,000 shares of Tivoli in 1950 for the price of $272,923.62 and a net gain of nearly that amount. Subsequently Alprin and Koerner filed similarly false returns claiming that their drafts, too, represented sales of stock to Tivoli in liquidation. The three men and Haas persisted in this story when questioned by Treasury agents in 1952. H. H. Klein first learned of Roer's intention after Roer had filed his 1950 return, when he came to Klein and unsuccessfully sought a letter that would support the false story that the draft was in liquidation of Tivoli. Klein learned of Alprin's claim that his draft, too, was in liquidation of Tivoli, only after Alprin had told that story to the Treasury. It is undisputed that Klein's statements to the Treasury in 1949 and 1952, the Tivoli books whose entries he controlled and possibly altered, and his personal income tax return filed in 1948 all contradict the story that Alprin, Koerner, and Roer received liquidating dividends. Hence on the record here Klein, in the period after 1948, could not be considered a party to a scheme by Roer, Koerner, and Alprin—to make tax returns on the basis that their drafts were in liquidation of Tivoli. On the other hand, they could still be parties to Klein's plot to conceal the payments.

6. *Miscellaneous Facets of the Conspiracy.* There was credible testimony that on September 16, 1946, the New York agent of the Royal Bank of Canada telephoned Klein to tell him that the OPA had subpoenaed the records of the Harwood's companies. Klein instructed the bank agent to send all his Dominion of Canada bonds then in New York to Montreal immediately, and not to produce the records requested by the OPA. The agent promised to send the bonds, but asked for written confirmation of his instructions. They came in a letter from Klein predated to appear as if it had been sent prior to the OPA subpoena. Eight million dollars of bonds were thus transferred to Canada from the United States.

Another incident, or series of incidents, which figured prominently in the case concerned the dealings between Klein's Tivoli Trading Co. and Regan Potter, one of the companies controlled by Klein and the three Canadians. The jury could have found that Klein decided to transfer $1,500,000 from Tivoli to Regan Potter by this device: the books of both corporations originally showed that Regan Potter had paid well over that amount in commissions to Tivoli. Klein instructed Haas and Rokoff to alter the books of Regan Potter and Tivoli to make it appear that $1,500,000 which had passed to Tivoli was only a loan. Subsequently Tivoli transferred that amount of money to Regan Potter in the form of bonds and recorded the transaction as the repayment of a loan. After September 1951 Klein falsely told Treasury agents that there had been a loan to enable Tivoli to buy a Scotch distillery, and that the money was paid back when the plan fell through. In the alternative, the Government claims, and the jury could have found, that the story of the loan was true. If the jury be-

lieved this, it could find an inconsistency between Klein's various stories and it could conclude that Klein lied to the Treasury in his 1947 return and in his statements to the agents in 1949 and 1952 concerning his acquisition of Tivoli from the three Canadians. The latter lie was within the period covered by the indictment.

7. *Summary of Acts of Concealment.* We summarize the acts of concealment of income which the jury might have found, pointing out that, as indicated, some of these are alternatives: (1) alteration of the books of Tivoli to make liquidating dividends appear as commissions; (2) alteration of those books to make a gratuitous payment of $1,500,-000 from Tivoli to Regan Potter appear as repayment of a loan; (3) a false entry in the Tivoli books to disguise as commissions paid what was actually a dividend paid to Klein which he diverted to Cuban corporate nominees of his personal friends; (4) a false entry in the Tivoli books to disguise as a commission paid the $35,000 paid to Haas' LaRibera corporation; (5) the removal of $8,-000,000 in bonds from New York to Canada; (6) the false statement in Klein's personal income tax return for 1947 to the effect that he purchased stock in Tivoli from the three Canadians for $375,000; (7) the false statement in the same return to the effect that Tivoli had "contingent liabilities" when it sold its assets to Hannes; (8) Klein's false answer in 1949 to Treasury interrogatories seeking him to identify the owners of various Cuban corporations and to state the nature and amount of funds paid to them by Tivoli; (9) Klein's false answer at the same time regarding his purchasing Tivoli from the three Canadians; (10) Roer's false return for 1950 in which he claimed that he sold Tivoli stock in that year for an immense profit; (11) Alprin's false statement to Treasury officials in 1952, claiming that his draft was in liquidation of his interest in Tivoli; (12) Koerner's false statement at the same time to the same effect; (13) Roer's similar statement;

(14) Haas' corroborating statement; (15) Klein's signing his 1949 interrogatories in 1952; (16) Klein's statement in 1952 clinging to his earlier position and denying that the drafts were in liquidation of Tivoli; (17) Klein's 1952 implication to the Treasury that the true value of Regan Potter could be obtained without treating as one of its assets the $1,500,000 due to Regan Potter from Tivoli in repayment of a loan; (18) Rokoff's evasive affidavit in 1953 denying that he remembered altering the Tivoli books; (19) Koerner's 1952 income tax return which falsely claimed a sale of Tivoli stock in 1952; (20) Alprin's 1952 income tax return, which made an identical false claim. The first ten events occurred before September 18, 1951; the last ten occurred within the more recent period.

■ We shall not trace the appellants' versions of the facts, since the jury presumably did not credit them. Suffice it to say that Klein and Rokoff told one tale, while Alprin and Haas told another. By and large each person clung to the version of the events he first reported to the Treasury, and the stories remained as conflicting at trial as they had been previously. The Government's case consisted in part of playing the various versions against one another and asking the jury to take pieces from each to form the more sinister composite version just described. So much for the salient facts; it is evident from this still incomplete recital that there was ample evidence to convict if the indictment will stand up and the judge's charge is adequate. Hence we turn next to an analysis of the crime charged.

8. *The Pleadings.* In its final form as reached in the superseding indictment, the Fifth Count in its paragraph marked 1 charged the conspirators with conspiring "to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Department of the Treasury in the collection of the revenue; to wit, income taxes." Paragraph 2 then charges:

"It was a part of said conspiracy that the defendants would conceal and continue to conceal the nature of their business activities and the source and nature of their income."

Three succeeding paragraphs charge as "further a part of said conspiracy" the acts of Alprin, Koerner, and Roer respectively in claiming net income as capital gains in stated years, referring obviously to the Tivoli drafts mentioned above. The final paragraph 6 charges as further a part of the conspiracy "that the defendants would make and cause to be made entries in certain books and records of Tivoli Trading Co., a Panamanian corporation, for the purpose of concealing the nature and source of the income received by the defendants herein." Then follow the "Overt Acts," of which only the first, the telephone conversation of February 29, 1952, between Klein and Alprin, went to the jury.

It is clear from this wording that the indictment is framed to make a general charge of impeding and obstructing the Treasury Department in the collection of income taxes, with the allegations of concealment, of misreporting of the Tivoli drafts, and of misstating the Tivoli book entries as particular instances, rather than as substitute and complete allegations of the substantive crime itself. This is made doubly clear by reference to the original count it superseded, which was attacked because a broad allegation of conspiring to defraud the United States in the collection of taxes was said to be limited by the addition of twenty-five words which would supersede all that precedes them and be insufficient to charge a crime, viz., "in that the defendants attempted to conceal and continued to conceal the nature of their business activities and the source and nature of their income." Although Judge Palmieri, on pre-trial motion to dismiss, specifically rejected this contention, United States v. Klein, supra, D.C.S.D.N.Y., 124 F.Supp. 476, 480, nevertheless the Government took pains to clear up the matter in this way.

 In view of this background we find no merit in the oft-repeated contentions that the prosecution and the trial court "expanded" the count in question to cover matters not originally intended and changed the theory of the case from time to time. There was considerable chitchat between court and counsel during the long trial containing expressions which, apart from the general context, might be taken as referring only to the charge of concealment; but certainly there was never a definitive interpretation restricting the broad allegations as stated or suggesting a stricter interpretation than that of Judge Palmieri, whose conclusions were accepted in the later trial. Mere failure to disclose income would not be sufficient to show the crime charged of defrauding the United States under 18 U.S.C. § 371. The statute, however, not only includes the cheating of the Government out of property or money, but "also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968. The evidence recounted above appears directly in line with the crime thus outlined.

 It is true that the emphasis shifted during the trial from charges of direct tax evasion to the broader claim thus envisaged. But this was due to defendants' success in obtaining dismissal of these specific claims on the court's acceptance of their theory that the admitted vast income produced by the business operations under scrutiny was actually owned by the foreign corporations nominally in possession. When the court sustained the Fifth Count, it became necessary for the Government to broaden its attack, and the defendants cannot well complain of that which they brought about. True, they now claim prejudice because what was excluded by reason of the decision on the first four counts was so inextricably mingled with what

was retained as to make impossible a fair trial based only on admissible evidence. But they did not seek a mistrial at the time; obviously they expected to press the advantage they had obtained to the point of securing judgment from either the court or the jury on the whole case. Possibly there may have been error in the court's favorable ruling; at any rate we do not think the defendants are in a position to complain or that the Government's case should be held totally destroyed by this merely partial decision against it.

■ The defendants' real objection has to be, therefore, not so much to a shift in position as to the generality of allegation relied upon. It is to be noted that Judge Palmieri also passed upon their motions for bills of particulars and denied them in the decision above referred to after the United States Attorney had submitted certain particulars, including the portions of the tax returns of Alprin, Koerner, and Roer alleged to be false. He held that the defendants had obtained all the information to which they were properly entitled and that a premature disclosure of the Government's case or evidence or its theory of prosecution could not be had. He referred to the desire disclosed by the defendants "to avoid the inconvenience incident to the preparation for trial of a criminal tax case involving very large sums of money and covering a period of several years" and added appositely: "But if the prospect of trial appears burdensome, it is attributable to the defendants themselves and to their methods of doing business. The defendants are familiar with their own transactions." 124 F.Supp. 476, 479. There is nothing in the trial record to indicate any error in this diagnosis or any essential prejudice to defendants in the preparation of their case. Before they testified in late July and August at a trial beginning in April and after a five weeks' gap in presentation of evidence to the jury while the parties were deciding upon the evidence to be preserved after the excision of the four counts, they knew the prosecution's case quite thoroughly. And of course they knew the detail of facts better than the prosecution could hope to know them. Any defects in allegation must therefore rest on strictly legal principles, rather than practical lack of information.

■ The generality of allegation now permitted is well settled, see, e. g., Glasser v. United States, 315 U.S. 60, 66, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Achtner, 2 Cir., 144 F.2d 49, and cases cited. The defendants are in substance contending for what has been referred to as the "baleful" theory-of-the-case doctrine, which has been repudiated in the civil rules and which is said to have no place in criminal procedure. United States v. Pape, 2 Cir., 144 F.2d 778, 781, certiorari denied 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602, upholding submission of alternate theories of fact to the jury; United States v. Groopman, 2 Cir., 147 F.2d 782, 785, 786, certiorari denied 326 U.S. 745, 66 S.Ct. 29, 90 L.Ed. 445. If this is so in the ordinary criminal cause, it seems peculiarly so here both legally and practically. Legally and logically the specific detail in the evidence supports the broad charge made. And practically the defendants, who caused the problem by their business ingenuity, if not criminal intent, have all the knowledge at hand. To hold otherwise is to offer a premium to prospective tax evaders in making their business operations so complicated that the Government cannot unravel them sufficiently to make allegations of purely factual detail.

■ The situation is well illustrated by the problem raised by the various versions as to the Tivoli drafts. We have detailed the versions presented by the prosecution of the drafts as either liquidating dividends of the corporation or as commissions paid the three men: Roer, Koerner, and Alprin. The issue eventually came to the question which set of witnesses was to be believed: the three or against them Klein and Rokoff. This was not a choice for the prosecution; it was for the jury. And since

918

either way would contribute to the scheme for obstructing the Government's knowledge and collection of revenue due, the prosecution was entitled to the alternative submission to the jury. United States v. Pape, supra, 2 Cir., 144 F.2d 778, certiorari denied 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602. Actually the court presented the matter to the jury, allowing it to find that the drafts were either a liquidating dividend or compensation or a gift, but with a condition attached, that they were to be given the appearance of a legitimate corporate expenditure until Klein's tax difficulties were over. In effect the court thus provided for the additional contingency that the jury might find both sets of witnesses lying. But it stressed the ultimate fact to be found of concealment and misleading and thus correctly made the proper submission. The defendants claim that this was a shift to the theory of three conflicting conspiracies. But the over-all purpose remained the same, even though there may have been divergencies in intent and purpose among the conspirators in the carrying out of some details. Nor did the split in view among the conspirators constitute an end of the conspiracy, for the concealment was not disavowed; it was the same conspiracy and there was no new one merely to hide the past, as in Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931. A limitation of the prosecution to one only of the theories advanced by the parties would have been an unfair limitation on proof of the ultimate fact in issue where the defense, and not the prosecution, had the evidence at command. For the income whose source and nature were being concealed was not primarily the drafts, but the Harwood's profits received much earlier by Klein and the three Canadians.

We shall not try to lay down any broad principles of criminal pleading, but, since a practical purpose is being subserved, cf. United States v. Lamont, 2 Cir., 236 F.2d 312, 317, shall hold that, under the circumstances here disclosed, the defend-

ants were fully and adequately informed by the indictment of the crime which they were called upon to answer. And the evidence being adequate to convict, the next question must be whether or not the judge's charge was fair and adequate.

■ 9. *The Judge's Charge.* The lengthy charge to the jury by the trial judge dealt in unexceptional manner with the necessary basic elements, such as the burden of proof and the presumptions. The attack upon it comes as a further step and natural corollary to the contentions we have already discussed with reference to the indictment. The trial judge refused to depart from the position he had taken that the over-all general charge was obstruction of the Treasury Department in the collection of the revenue, and hence he declined to make specific acts of concealment the basis of the Government's case or instruct the jury that the prosecution was limited to certain theories. In this we think he was correct for the reasons we have already stated. The scope of the prosecution was broader than the defendants' contentions assume, and the judge committed no error in so holding.

■ Since we support this conclusion of the trial court we think it not incumbent upon the judge or perhaps even wise for him to discuss in more detail the possible theories permissible under the evidence, or, as the defendants would have it, the separate conspiracies which might have been found to exist. There was a very real danger of overemphasis of the parts to hide the whole. He did make clear that the jury must find a common design with unity of purpose. Thus his exact words at one point were:

"When the Government relies upon circumstantial evidence to establish the conspiracy, as here, the circumstances must be such as to warrant your finding that the alleged conspirators had some unity of purpose, some common design and undertaking, some meeting of minds in an unlawful arrangement and the

doing of some overt act to accomplish its object."

And again:

"The Government must have proved beyond a reasonable doubt that a defendant was knowingly associated in the unlawful common enterprise; that he participated in it wilfully with intent to further the common purpose or design."

Since the defendants were arguing strenuously for the separate purposes, this is a clear direction that conviction required more than such separate conspiracies. Of course it would have been improper to charge that the existence of separate purposes necessarily negatived a common design. The course the judge took quite neatly avoided that trap.

■■■ Again the court charged expressly that there must be a finding that the conspiracy charged did exist in fact, that a defendant to be found guilty must have knowingly participated in it, and that he did not withdraw from it on or before September 17, 1951. This was reiterated later when the jury was again required to answer affirmatively the query "was an overt act in furtherance of the conspiracy committed after September 17, 1951?" This disposes of the claim of error based upon the statute of limitations particularly stressed by defendant Haas.

The difficult nature of the case presented some obvious problems for the court in fashioning a proper charge. It could easily stress details which had become prominent in the course of trial and thus give them an importance that they did not deserve. And such a course could easily lead to unfairness to one or more defendants. We think that on the whole the judge walked warily amid the dangers and gave a charge which was fair and adequate. That it covered activities of wide scope was in the nature of the case as fashioned primarily by the defendants themselves. Defendants say rather plaintively that the charge was as long as the jury's deliberations and complain because the jury took only some

three hours to reach its verdict. But the ultimate fact was simple and the judge succeeded in keeping it from being concealed by the multitudinous details.

10. *Miscellaneous Objections.* We may dismiss somewhat more briefly certain further claims of error, although these, too, were pressed with their customary vigor by defendants' able counsel.

■■■ (a) The defendants raise the issue, stressed particularly by Alprin, of what they term "double jeopardy." They say that the Fourth Count—one of those which resulted in a judgment of acquittal by order of the court—being a charge of conspiracy to conceal the income taxes of Klein and his Canadian associates, was the same as the Fifth Count, upon which conviction was later had. It is obvious that evidence in support of the Fourth Count would be admissible also under the Fifth Count, though the latter was of substantially wider scope. Whether or not this would have afforded sufficient ground of distinction we need not .consider, since it is clear that there is no double jeopardy from differing dispositions of counts of a single indictment at a single trial. The prosecution may allege the same charge in different counts with the protection that only a single penalty is permitted. When there are double penalties we reverse one, not both; and, as is well settled, a jury acquittal on one count does not require reversal of conviction on another count, even though there may seem a surface inconsistency. See, e. g., United States v. Nickerson, 7 Cir., 211 F.2d 909, 911; Barsock v. United States, 9 Cir., 177 F.2d 141, 143; Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; Dealy v. United States, 152 U.S. 539, 14 S.Ct. 680, 38 L.Ed. 545. While the trial judge here spoke in terms of acquittal (following the motions), his action was no different than had he awaited the conclusion of the trial and then declined to submit the particular count to the jury for lack of proof.

(b) Klein asserts error in the admission in evidence against him of statements made by coconspirators Koerner and Roer to Treasury officials in the fall of 1952. These had to do with the Tivoli drafts and attempted to justify the capital gains treatment of these drafts. At the trial the two men claimed their privilege against self-crimination and could not be examined. The prosecutor, when asked by defense counsel whether he offered the statements as true or false, refused to say and was upheld by the trial judge. It is now asserted that the prosecutor argued later that they were true and that at most the statements could be received only against coconspirators as false.

We see no error in the rulings affecting these exhibits. The statements were clearly admissible as those of conspirators during the conspiracy and as to its scope and purpose; even though the conspirators had somewhat fallen out by this time (1952), yet the conspiracy could be held to continue—as we noted above—and the jury so found. If admissible, the exhibits are a part of the evidence for whatever assistance they may be to the triers in ascertaining the truth. We do not see why or how they are to be discredited unless they are false and so claimed by the prosecutor; this again smacks of forcing a theory of the case upon the parties or the court where the ultimate decision is for the triers of fact. Nor, in any event, do we see any problem. The Government now quite properly points out that it was claiming all the protagonists to be liars and that the court's charge limited use of the statements only if the jury found them to be made in furtherance of the conspiracy, i. e., logically either false or misleading.

■ (c) Haas claims a variance between indictment and proof by attempting a differentiation between the functions of assessment and of collection of the revenue; the first, so he says, is that of the Treasury Department as alleged, while the second is only that of the Collector of Internal Revenue. His highly technical argument and citations do not really impugn the over-all responsibility of the Treasury for the entire task of securing the revenue. Further, there is no possibility that he was at all misled by the allegation. His additional contention that, like the earlier counts, the Fifth Count should be based on a conspiracy to violate the substantive offense of tax evasion defined in the revenue laws, Internal Revenue Code of 1939, § 145(b) or 3616 (a), 26 U.S.C. §§ 145(b), 3616(a), rather than one to defraud the United States under 18 U.S.C. § 371, we also find without merit. For the prosecution was obviously aiming at a broader charge, as is permissible on the authorities. Kobey v. United States, 9 Cir., 208 F.2d 583; Benatar v. United States, 9 Cir., 209 F.2d 734, certiorari denied 347 U.S. 974, 74 S.Ct. 786, 98 L.Ed. 1114; Rumely v. United States, 2 Cir., 293 F. 532, certiorari denied 263 U.S. 713, 44 S.Ct. 38, 68 L.Ed. 520.

■ (d) Alprin and Haas claim that the indictment should have been dismissed against them, since they were compelled, in violation of their rights under the Fifth Amendment to the Constitution, to give incriminating testimony before the Grand Jury which later indicted them. They were warned by the prosecutor through their counsel, who told them of the warning, that he had information upon which there was a possibility of an indictment; but there was no indictment at the time, and they raised no objection and testified with apparent willingness, although of course under subpoena. They raised this issue before trial and Judge Palmieri ruled against them, United States v. Klein, D.C.S.D.N.Y., 124 F.Supp. 476, as did Judge Weinfeld with respect to a perjury indictment brought against Haas by this same Grand Jury, United States v. Haas, D.C.S.D.N.Y., 126 F.Supp. 817. We have found some difficulty in establishing a clear-cut rule as to the necessity of a warning of constitutional rights, under these circumstances, see United States v. Scully, 2 Cir., 225 F.2d 113, certiorari denied Scully v. United States,

350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788, and cf. United States v. Giglio, 2 Cir., 232 F.2d 589, 594, certiorari granted 352 U.S. 865, 77 S.Ct. 91, 1 L.Ed.2d 74. But as Judge L. Hand has said, "the relevant inquiry ought always to be whether the testimony was freely given, all things considered." United States v. Block, 2 Cir., 88 F.2d 618, 621, certiorari denied Block v. United States, 301 U.S. 690, 57 S.Ct. 793, 81 L.Ed. 1347. Here the defendants were lawyers of training and experience; they were represented throughout these earlier proceedings, as later, by resourceful counsel; they made no sign of unwillingness. We find no error in Judge Palmieri's rulings.

In summary we find that defendants had a rigorously fair trial wherein their rights were sedulously guarded. The convictions were amply justified. Here tremendous American profits were skillfully concealed from the collectors' eyes until they were uncovered by this patient investigation and trial. The result should be salutary.

Convictions affirmed.