**UNITED STATES of America**

v.

**Leona M. HELMSLEY, Joseph V. Licari, and Frank J. Turco, Defendants.**

**No. 88 Cr. 219 (JMW).**

United States District Court, S.D. New York.

Aug. 25, 1989.

James R. DeVita, Cathy Seibel, Asst. U.S. Attys., Diane M. Peress, Alfredo F. Mendez, Sp. Asst. U.S. Attys., New York City, for U.S.

Gerald Feffer, James R. Bruton, Eva Petko, Karen Zacharia, Williams & Connolly, New York City, for defendant Helmsley.

Joseph Benfante, New York City, for defendant Licari.

William Brodsky, Baden, Kramer, Huffman & Brodsky, P.C., New York City, for defendant Turco.

## MEMORANDUM AND ORDER

WALKER, District Judge:

The Court must address two outstanding matters before this case is submitted to the jury. First, defendants ask this Court to charge the jury that the tax conspiracy delineated in Count One of the indictment has only four objects, rather than five, as the government argues. Second, defendants move, pursuant to Fed.R.Crim.P. 29, for a judgment of acquittal on Counts Forty through Forty-six. For the reasons set forth below, both applications are denied.[1]

## I. DISCUSSION

*A. Objects of the alleged conspiracy:*

■ The indictment in this case charges that the defendants entered into a conspiracy pursuant to 18 U.S.C. § 371, which provides, in relevant part, that

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined ... or imprisoned ...

More specifically, the indictment charges the defendants with conspiring to violate "Title 26, United States Code, Sections 7201 and 7206, and Title 18, United States Code, Section 1341, and to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ..." Indictment ¶ 25. The indictment then contains a section headed "Objects of the Conspiracy" that sets forth four objects that parallel specific offense objects enumerated in paragraph Twenty-five, but omits further elaboration on the object of defrauding the IRS. The references in the "Objects of the Conspiracy" section are to tax evasion, the making and subscribing of false tax returns, the aiding and assisting of the preparation and presentation of those returns, and mail fraud.

Based on the omission from the "Objects of the Conspiracy" section of a reference to the object of defrauding the IRS—an object that *is* set forth in paragraph Twenty-five—the defendants now argue that the Court cannot charge the jury on the object of defrauding the IRS because that would permit, in effect, a constructive amendment of the indictment. Tr. at 6573. In sum, defendants contend that the government has insufficiently charged a so-called *Klein* conspiracy. Tr. at 6578. *See United States v. Klein,* 124 F.Supp. 476 (S.D.N.Y. 1954), *aff'd,* 247 F.2d 908 (2d Cir.1957).

In that case, the government charged the conspirators, pursuant to 18 U.S.C. § 371, with conspiring

to defraud the United States *by impeding, impairing, obstructing and defeating the lawful functions of the Department of the Treasury* in the collection of the revenue; to wit, income taxes ... It was a part of said conspiracy that the defendants would conceal the nature of their business activities and the source and nature of their income.

*Klein,* 247 F.2d at 915–916 (emphasis added, citation omitted). Since the present indictment does not contain the words "by impeding, impairing, obstructing and defeating the lawful functions of" the IRS, defendants argue that, while the indictment charges a conspiracy to commit specific offenses against the United States, it

---

1. The exigencies of trial preclude an exhaustive review of the underlying positions of all sides. The Court incorporates by reference the arguments previously advanced on the record and carefully considered by the Court, and refers interested parties to the official transcript of this case. *See* Tr. 6573–6579, 6881–6888, 6898–6913.

does *not* sufficiently charge a conspiracy to defraud the United States. *See, e.g.*, Tr. at 6575.

In *Klein*, the Second Circuit sought to ensure that the indictment at issue was not "too vague and general to afford a proper basis for a felony trial and conviction." *Klein*, 247 F.2d at 910. That inquiry similarly guides this Court's evaluation of the present indictment. Under such an analysis, the Court easily concludes that the indictment satisfies any concern defendants might articulate.

First, although perhaps without the specificity the defendants now [2] say they would prefer, the government *did* charge as an object of the conspiracy the "defraud[ing] of the United States, and an agency thereof, to wit, the Internal Revenue Service ...," even if it did not outline that object specifically in the "Objects of the Conspiracy" section of the indictment. *See* Indictment ¶ 25. Second, and more important, the indictment not only reveals the government's reliance on the "defraud the United States" provision of Section 371, but also sets forth the defendants' alleged scheme to defraud the IRS in painstaking detail.

These defendants do not, and cannot, legitimately claim insufficient notice of the government's claim of fraud on the IRS. The defendants never specifically requested the government to particularize its contention that they had conspired to defraud the United States, notwithstanding exhaustive requests for particulars on every aspect of the government's case, and the defendants do not claim that they were misled in not doing so. More important, the indictment, read as a whole, including a lengthy "Means of the Conspiracy" section, leaves no doubt that the defendants were fully informed of the precise manner in which the government was claiming the IRS to have been defrauded. This is so despite the absence of the "impeding, impairing, obstructing and defeating" language of *Klein*, which defendants apparently deem talismanic. *See, e.g.*, Indictment ¶¶ 32–45.[3]

The Court is not presented here with a case of shifting theories of culpability, or a case where the essential nature of the alleged conspirators' plan is unclear. *See, e.g., United States v. Rosenblatt*, 554 F.2d 36 (2d Cir.1977). The government's position throughout this entire prosecution, and long before trial, has been consistent: the defendants conspired to defraud the IRS by concealing income to the Helmsleys by having company payments for Dunnellen Hall disguised as legitimate company business expenditures, chiefly through the use of false invoices. The defendants have never claimed surprise by any portion of the government's proof at trial. Unsurprisingly, then, defendants have not even attempted to articulate any prejudice they might have suffered from the absence of the "impeding, impairing, obstructing and defeating" language in the indictment.

After carefully reviewing the relevant authorities, the Court concludes that defendants now advance, in the eleventh hour and for the first time, a hyper-technical objection that lacks merit. Under the circumstances, the defendants were fully and adequately informed by the indictment of the crime which they were called upon to answer. Accordingly, the Court will charge the jury on the object of defrauding the IRS.

*B. Counts Forty through Forty-six:*

■ Counts Forty through Forty-six charge the defendants with mail fraud, pursuant to 18 U.S.C. § 1341, alleging that they billed more than one million dollars in personal expenditures to subsidiaries of Realesco, and caused the Park Lane Hotel, a Realesco asset, to pay defendant Helmsley "consulting fees" at a rate of $83,-333.34 per month. The government con-

---

**2.** The indictment in this case was filed on April 14, 1988. In the sixteen months since, the defendants never advanced the issue raised here.

**3.** For example, paragraph Thirty-two alleges that "[i]t was further part of the conspiracy that the defendants would and did create false and fraudulent documents to disguise the fact that costs charged to business entities had in fact been incurred in renovating, furnishing, decorating and operating Dunnellen Hall."

tends that the defendants schemed to defraud Realesco's minority shareholders.

The background of the banks' involvement with Realesco is not insignificant. Before the banks became minority shareholders of Realesco, they had been creditors of an entity called Investor's Funding Corporation, which, all parties agree, faced bankruptcy. In a reorganization structured by Helmsley Enterprises, the banks exchanged roughly $50 million in loans, which were unlikely to be redeemed, for Realesco stock. It is not unreasonable to conclude that these minority shareholders, perhaps even more than ordinary shareholders, were concerned with the value and stability of the property underlying their investment.

In brief, defendants, relying on *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) and its progeny, claim that those minority shareholders could not have been defrauded of any money or property. As defendants argue,

> The agreements fixed the amount of special and quarterly dividends to be received by the banks and a share purchase price to be received by the banks upon redemption ... The banks redeemed their shares in April of 1986 ... [Officers of the banks] stated that the banks received the full, agreed upon sales price for their shares ... [B]ecause of restrictions on minority shareholder's rights, they were entitled to certain fixed payments with the possibility of a supplemental dividend. Since the supplemental dividend was not affected by the alleged taking of money or property from Realesco the government has not advanced sufficient evidence to make out the crime.[4]

The Court recognizes that the object of a scheme to defraud, alleged pursuant to Section 1341, must remain the deprivation of money or property. *See United States v. Evans*, 844 F.2d 36, 39 (2d Cir.1988). And the Court further recognizes that almost any deprivation of intangible rights could be theorized to deprive some party of tangible rights. The deprivation of the faithful services of an employee, for instance, might deprive his employer of that "increment of ... salary that it paid for his honesty and loyalty." *United States v. Regan*, 713 F.Supp. 629, 637 (S.D.N.Y. 1989). If that were the case, however,

> all that would be required to prosecute schemes to defraud persons of their intangible rights would be cleverly worded indictments reciting some tangible consideration paid by the victims of the fraud for the intangible rights of which they were defrauded.

*Id.*

While sensitive to the concerns raised by defendants, this Court need not pass today on the propriety of such hypothetical indictments.[5] For the purposes of the present motion, it remains sufficient to note that the government has sufficiently alleged, and has offered sufficient proof of, a property loss. As defendants admit, the banks "received 22% of the common shares" of Realesco. Bruton Letter at 2. The banks thus held shares with full voting authority. *See* Ex. 1100 ("Restated Certificate of Incorporation") at 6; Ex. H 450 ("Shareholders Agreement") at 11.[6] The underlying agreements at issue here are not merely loan agreements, and the banks are not mere bondholders. Instead, they are shareholders who own voting stock in a corporation.

Regardless of whatever restrictive provisions may govern the minority shareholders' rights—such as the predetermined dividend and redemption rates—defendants cannot dispute that the banks, as share-

4. Letter to the Court of James A. Bruton, III, counsel for defendant Helmsley, dated August 22, 1989, at 2, 4 ("Bruton Letter").

5. Indeed, such indictments now appear unnecessary. Although not implicated by the present motion, the Court notes the recent legislative reversal of *McNally*. Section 1346, adopted in 1988, ensures that mail fraud encompasses

"scheme[s] ... to deprive another of the intangible right of honest services." *See* 134 Cong.Rec. H 11251 (daily ed. October 21, 1988) (statement of Rep. John Conyers).

6. The banks also owned 100% of a class of participating preferred shares. *See* Bruton Letter at 2.

holders, were part-owners of Realesco. As such, during the period covered by the indictment, they retained residual rights to the corporate assets. Defendants, for instance, do not argue that the minority shareholders would have no rights upon a voluntary or involuntary dissolution or liquidation of the corporation. *See* Ex. 1100 at 18. A scheme that allegedly wastes or dissipates a portion of those assets—either by charging personal expenditures to subsidiaries of Realesco or by paying defendant Helmsley "consulting fees"—thus potentially deprives those shareholders of tangible property. Indeed, as the government notes, had they been aware of the alleged scheme, those shareholders could have maintained a derivative action, pursuant to Sections 626 and 720 of the New York Business Corporation Law, to compel the Helmsleys to repay Realesco. *See Rapaport v. Schneider*, 29 N.Y.2d 396, 400, 328 N.Y.S.2d 431, 435, 278 N.E.2d 642, 644 (1972) ("The statute is broad and covers every form of waste of assets and violation of duty whether as a result of intention, negligence, or predatory acquisition.").[7]

In the circumstances of this case, the indictment and the proof—taken in the light most favorable to the government—demonstrate a property interest sufficient to support a mail fraud charge. Accordingly, defendants' motion pursuant to Fed.R. Crim.P. 29 for a judgment of acquittal on Counts Forty through Forty-six is denied.

## II. CONCLUSION

For the reasons set forth above, defendants' applications are denied in their entirety.

SO ORDERED.

---

**7.** Defendant contends that a "consulting fee would have been permissible under the 'Shareholder's Agreement.' Ex. H 450, p. 19." Bruton Letter at 4. It remains far from clear, however, whether such a fee could be considered "customary in the trade," as the Shareholder's Agreement mandates. A subsidiary of Helmsley Enterprises provided management services in the fiscal year ending June 30, 1986 for a total fee of $656,332. *See* Ex. H 580. For the calendar year 1985, defendant Helmsley received a salary of $618,699.98 from that subsidiary, Ex. G2292, which could fairly be seen as the "management fee" envisioned by the Shareholder's Agreement.