HELENE N. WHITE, Circuit Judge,
concurring.
I concur but write separately to explain my reasoning regarding Defendants’ challenges to the sufficiency of the evidence.
I. Count 1: Conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371, § 1341, and § 1343
To support a conspiracy conviction, the government must establish: (1) the existence of an agreement to violate the law, (2) that the defendant knowingly and willfully joined the agreement, and (3) that a conspirator committed an overt act in furtherance of the agreement. See United States v. Fisher, 648 F.3d 442, 448 (6th Cir.2011). Count 1 of the superseding indictment charges conspiracy to commit mail and wire fraud. See 18 U.S.C. §§ 1341, 1343. The elements of mail fraud and wire fraud are essentially the same, “the only difference being that a wire communication, e.g., telephone call, is required instead of a mailing.” United States v. Bibby, 752 F.2d 1116, 1126 (6th Cir.1985). A conviction requires proof that the defendant devised or willfully participated in a scheme or artifice to defraud, using the mails or a wire communication in furtherance of the scheme, with the intent to deprive a victim of money or property. See United States v. Faulkenberry, 614 F.3d 573, 581 (6th Cir.2010); United States v. Frost, 125 F.3d 346, 354 (6th Cir.1997). “A scheme to defraud includes any plan or course of action by which someone intends to ... deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises.” United States v. Daniel, 329 F.3d 480, 485 (6th Cir.2003) (quoting United States v. Gold Unlimited, Inc., 177 F.3d 472, 479 (6th Cir.1999)). To establish a scheme to defraud, the government must prove that the defendant made a material false statement or omission, i.e., a statement or omission “that would have affected a reasonable person’s actions in the situation.” Id. But the government need not prove “that the intended victim was actually defrauded; the actual success of a scheme to defraud is not an element of either § 1341 or § 1343.” United States v. Merklinger, 16 F.3d 670, 678 (6th Cir. 1994).
Barkus argues that the evidence was insufficient to support his conviction under Count 1 because the government failed to show that Helfgott agreed to participate in the alleged conspiracy, and thereby failed to establish that venue was proper and to prove the existence of an agreement more generally. I disagree. Helfgott testified that “it’s not really the way a trust account should be used,” but he agreed with Bar-kus to use his IOLTA to help Barkus manage his finances and deal with creditors. (PID 7005, 6980) Helfgott testified that he received wires and checks into his IOLTA and disbursed the money placed in the account at Barkus’s direction, and sometimes Lombardo’s, and it was “used primarily to pay expenses, personal expenses of Mr. Barkus and Mr. Lombardo, or pay directly to them.” (PID 6982). Helfgott processed deposits into the IOLTA from, inter alia, investors Joan LaCount, James Brundidge, Brigitte Cunningham, and Anna Szczepanski, each of whom testified that they believed their funds represented an “investment,” not a *623 personal loan. (PID 8548-49 La Count; PID ,7489-90, 7158 Brundidge; PID 7856, 7859 Szczepanski; PID 7917-21 Cunningham.) The government also introduced evidence that Helfgott himself solicited investors. Specifically, Helfgott contacted Samuel Robinson, whom he knew through a mutual friend. Robinson testified that Helfgott asked, on Barkus’s behalf, for $60,000 in “bridge financing” to help put together a company that would be involved in “developmental projects overseas” in Indonesia and “a lot of other countries.” (PID 7508-09.) Helfgott promised Robinson that he would receive $90,000 on his $60,000 investment after ninety days. (PID 7509, PID 7148.) Robinson wired the money to Helfgott’s IOLTA and received a promissory note signed by Bar-kus. (PID 7511-12, 7158.) Helfgott testified that Robinson’s money was thereafter disbursed at Barkus’s direction but was not used to finance the project associated with' Robinson’s loan. (PID 7148) The ninety days passed without payment to Robinson. When Robinson persisted in requests for repayment, Helfgott solicited funds totaling $70,000 from Brundidge (PID 7489-90), characterizing the money as an investment (PID 7157-58). Helfgott deposited the money from Brundidge into the IOLTA and Barkus used the money from Brundidge to pay Robinson. PID 7158; 9121. A rational juror could infer from this evidence the existence of an agreement to commit mail and wire fraud, that Helfgott knowingly participated in the agreement, and that in disbursing funds related to Robinson’s and Brundidge’s investments, Helfgott committed an overt act in furtherance of the conspiracy in the Northern District of Ohio. .
Lombardo contends that insufficient evidence supports his conviction under Count I because the government failed to prove that he agreed to participate in or knowingly joined the conspiracy, and failed to prove that he committed an overt act. As to Lombardo’s overt-act argument, the government need not prove that each participant in a conspiracy committed an overt act; it need only prove that one or more of the conspirators did so. See 18 U.S.C. § 317. Lombardo’s sufficiency argument also fails. Helfgott testified that the funds in the IOLTA were used primarily for Barkus’s and Lombardo’s personal expenses and testified to maldng multiple disbursements from the IOLTA to the PCF account, on which Lombardo was a signatory; Special Agent Dever testified that Lombardo and Barkus personally received approximately equal amounts of money over the course of the conspiracy, about $500,000, through the PCF and IOLTA accounts (PID 9097). Lombardo contends that although he received money from Barkus, his receipt of funds does not connect him to the scheme because there is no evidence that he knew how Barkus obtained the funds. But Francis Buckley testified that Lombardo showed him a check for $50,000 from an investor in Au-raSoothe and stated that he planned to use the money to buy a ring for his wife. (PID 7977) And Victor Rothgarn testified that he met Barkus and invested in Aura-Soothe through Lombardo. Rothgarn twice invested $50,000 in return for one-percent interests in AuraSoothe. He made his first check payable to the PCF account, writing “loan” in the memo line at Lombardo’s direction although he considered the money an investment. (Rothgarn Dep. 15-16) When Barkus solicited the second $50,000 investment from Rothgarn, Rothgarn wired funds directly to the IOLTA. A rational juror could infer from the evidence that Lombardo was aware of the manner in which the IOLTA was being used, as well as the money wired into it, and willingly participated in the scheme to defraud.
*624 II. Count 6: Conspiracy to defraud the United States in violation of 18 U.S.C. § 371
Count VI charged Barkus and Lombar-do with a Klein conspiracy, i.e., with conspiring “to defraud the United States by deceitful and dishonest means for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the [I.R.S] in the ascertainment, computation, and collection of taxes owing.” See United States v. Sturman, 951 F.2d 1466, 1472 (6th Cir.1991) (citing United States v. Klein, 247 F.2d 908 (2d Cir.1957)). To prove a Klein conspiracy, the government must establish: (1) the existence of an agreement to defraud the United States, (2) that the defendant knowingly and willfully joined the agreement, and (3) that a conspirator committed an overt act in furtherance of the agreement. See United States v. Fisher, 648 F.3d 442, 448 (6th Cir.2011).
Barkus contends that insufficient evidence supports his conviction under Count 6 because the government did not prove that Helfgott knew of Barkus’s 1993 tax lien, and therefore did not prove that Helf-gott shared the objective to use the IOLTA to obstruct the assessment and collection of taxes. But, although Helfgott testified that he did not know of Barkus’s tax liability when he and Barkus first made plans regarding use of the IOLTA, he testified that he subsequently learned of the lien, knew at the time that placing money in the IOLTA would obstruct the I.R.S.’s assessment and collection efforts, and yet continued to use the IOLTA in the same manner. (PID 6982-83) Barkus points to Helfgott’s testimony that he never had a conversation with Barkus during which he explicitly agreed to use the IOLTA to hide money from the I.R.S., but evidence of a formal written or spoken agreement is not required to support a conspiracy conviction; a “ ‘tacit or mutual understanding among the parties’ is sufficient.” Fisher, 648 F.3d at 451 (quoting United States v. Crossley, 224 F.3d 847, 856 (6th Cir.2000)). Accordingly, a rational juror could conclude that Helfgott was aware of Barkus’s tax lien and shared Count 6’s conspiratorial objective.
Lombardo argues that insufficient evidence supports his conviction under Count 6 because, even if Helfgott was aware of Barkus’s tax lien, the government failed to introduce evidence showing that Helfgott was aware of Lombardo’s tax lien. But Helfgott testified that he became aware of both Barkus’s and Lombardo’s tax liens by “at least 2005,” and that he was aware that Lombardo and Barkus were business partners and “assumed if one had a lien, the other one did too.” (PID 7334-36, 7442-43, 45) Viewing Helfgott’s testimony in the light most favorable to the prosecution, a rational juror could conclude that Helfgott was aware of Lombardo’s tax liability and, as with Barkus, shared in the agreement to obstruct the I.R.S.’s assessment and collection of Lombardo’s tax obligation.
III. Count 5: Securities Fraud in violation of 15 U.S.C. § 78j(b) and 78ff
Count V charges Barkus and Lombardo with securities fraud. “The offense of securities fraud under 15 U.S.C. § 78j(b) is ‘quite similar’ to mail fraud ‘in that it also calls for proof of a scheme or design to defraud incident to the purchase or sale of a security’ and ‘the use of an instrumentality of interstate commerce or of the mails in furtherance of that scheme or design.’ ” United States v. Coffman, Nos. 12-5574, 12-5611, 12-6090, 2014 WL 3673028, at *3 (6th Cir. July 22, 2014) (quoting United States v. MacKay, 491 F.2d 616, 619 (10th Cir.1973)). “Both statutes require a specific intent to defraud.” United States v. *625 DeSantis, 134 F.3d 760, 764 (6th Cir.1998). To have the requisite intent, “a defendant must knowingly make a material misrepresentation or knowingly omit a material fact,” and “the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission.” Id.
The parties’ arguments regarding securities fraud focus on Victor Rothgarn’s investment. Barkus and Lombardo contend that Rothgarn’s investment does not support their securities-fraud convictions. They point to Rothgarn’s testimony that he saw bottles of AuraSoothe lotion, he spoke with Lombardo regarding Lombar-do’s efforts to market the product, Lom-bardo never asked him to fund other ventures or to do anything illegal, and Rothgarn believed he had made a bad business decision. This testimony does not undermine the verdict; a rational juror could nonetheless conclude that Bar-kus and Lombardo made material misstatements to Rothgarn to induce him to invest. Rothgarn purchased his first one-percent share in AuraSoothe in February 2004 for $50,000. As noted, Helf-gott testified that although Rothgarn’s purchase agreement stated that Rothgarn was purchasing the shares from a “trust,” no trust related to AuraSoothe existed at the time or was ever established. (PID 7127-29) In October 2004, Rothgarn purchased a second one-percent share in AuraSoothe. He did so “hesitantly” because he did not have the money on hand and would have to withdraw funds from his 401(k), but Barkus was “adamant” that he invest, Lombardo assured him that the investment was a “for-sure thing,” and he was told that his money would “double.” (Rothgarn Dep. 29, 67, 85.) He made the investment only after agreeing with Barkus and Lombardo that he could receive $20,000 back upon request at any time to reimburse his 401(k). (Rothgarn Dep. 32-33) When he did subsequently request the $20,000, however, he received only two checks of $5000 each, and only after pushing for .repayment. (Rothgarn Dep. 71.) Moreover, Rothgarn’s initial purchase agreement stated that if he asked to withdraw his investment between twelve to fourteen months after purchasing his share, he would receive a $60,000 repayment on his $50,000 investment, but Rothgarn testified that he did not exercise that right because he “kept being told that this thing is going to be big, we’re just months away, you’re going to double your money.” (Rothgarn Dep. 118.) Several times Barkus and Lombar-do made representations that a sale of the company was “right around the corner,” and that “everything was going as planned,” but no sale ever materialized and Rothgarn never recovered his. investment. (Rothgarn Dep. 77-78.) Special Agent Dever testified that funds from Rothgarn, and funds in AuraSoothe’s accounts generally, were transferred to Lombardo’s and Barkus’s personal bank accounts and used to pay personal expenses. (See PID 9162-9166, 9180-81; 7256.) Drawing all inferences in the government’s favor, a rational juror could conclude that Barkus and Lombardo knowingly made false promises of profits and repayment to Rothgarn to induce him to invest in AuraSoothe.
IV. Counts 8, 10, 11, 14, and 15: Tax evasion in violation of 26 U.S.C. § 7201 (Lombardo)
The elements of tax evasion are “willfulness; the existence of a tax deficiency; and an affirmative act constituting an evasion or attempted evasion of the tax.” United States v. Heath, 525 F.3d 451, 456 *626 (6th Cir.2008) (quoting United States v. DeNiro, 392 F.2d 753, 758 (6th Cir.1968)). Count 8 of the indictment charges Lom-bardo with tax evasion arising from the calendar year 1993. Specifically, the indictment alleges that Lombardo evaded payment of taxes in 1993, and then after the I.R.S. lodged the tax lien against him in 2000, evaded collection through use of the IOLTA, by using corporate names to conceal assets, by filing false tax returns in 2001 and 2002, and by filing a fraudulent bankruptcy petition. Counts 10, 12, 14, and 15 charge Lombardo with evading assessment of taxes owed in the tax years 2003, 2004, 2005 and 2006 by failing to file income tax returns as required by law and by using the IOLTA to pay personal expenses and using corporate names to hide assets. Count 14 includes the additional allegation that Lombardo evaded taxes by filing a fraudulent bankruptcy petition.
Regarding Count 8, Lombardo alleges that the government failed to introduce sufficient evidence that he willfully attempted to evade payment of taxes. Rather, Lombardo contends, the evidence shows mere delay in the payment of taxes which is not criminal under § 7201. See Edwards v. United States, 375 F.2d 862, 867 (9th Cir.1967). In support of his contention that he was not attempting to evade payment, Lombardo points to evidence that he consulted tax professionals during the appeal of the audit of his 1993 return, and he submitted an offer in compromise on the 2000 tax lien, to which he did not receive a response. In February 2004, he withdrew the offer in compromise, and almost two years later, after suffering a stroke, Lombardo filed for bankruptcy, listing the I.R.S. as a creditor holding a .tax lien of $1,220,724.64. The bankruptcy court ordered the debt discharged.
As the government contends, however, the described conduct is not inconsistent with a determination that Lombardo attempted to evade payment: filing the offer in compromise suspended the I.R.S.’s collection efforts, and listing the I.R.S. as a creditor in the bankruptcy petition offered Lombardo the opportunity to discharge the debt entirely. More importantly, the jury also heard Helfgott’s and Special Agent Dever’s testimony that Lombardo received funds totaling over $500,000 from the IOLTA from 2001 through 2006, and I.R.S. officers Kristy Morgan and Gregory Yurick testified that Lombardo did not disclose the receipt of these funds to the I.R.S. or in his bankruptcy petition, and his bankruptcy petition did not disclose any ownership or membership interest in Timbertop or AuraSoothe, any status as an officer of those entities, his status as a signatory on the PCF account,, or the receipt of any personal loans. (PID 5745-47; 8747-69) This evidence, combined with Lombardo’s failure to file tax returns in the tax years related to Counts 10, 12, 14, and 15, supports Lombardo’s conviction of each of the tax-evasion charges.