UNITED STATES of America,
Plaintiff–Appellee,

v.

Howard (Ted) FURKIN, Defendant–
Appellant.

Nos. 95–3911, 95–3973.

United States Court of Appeals,
Seventh Circuit.

Argued April 1, 1997.

Decided July 14, 1997.

Patrick J. Chesley (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Daniel G. O'Day (argued), Cusack, Fleming, Gilfillan & O'Day, Peoria, IL, for Defendant–Appellant.

Before BAUER, CUDAHY and MANION, Circuit Judges.

BAUER, Circuit Judge.

Before us are two direct appeals from separate criminal convictions of Howard (Ted) Furkin. In cause 94–30014, "the gambling case," Furkin was convicted by a jury of conspiracy to defraud the IRS, witness tampering, obstruction of justice, and dealing in unregistered gambling devices. In cause 94–

30030, "the gun case," Furkin was convicted by a jury of possession of an unregistered sawed-off shotgun. At a joint sentencing hearing for both cases, Furkin was sentenced to 144 months' incarceration, to be followed by three years of supervised release; he was fined $250,000 plus the cost of incarceration; and he was ordered to pay $2,149,338 in restitution to the IRS. Furkin appeals his convictions in both cases and his sentence on numerous grounds, none of which has any merit. We affirm.

## BACKGROUND

Furkin was the sole owner of a corporation called Allstar Music. Allstar was in the business of leasing amusement machines, such as pool tables, pinball machines, and jukeboxes, to bars and service clubs. In the early 1980's, Furkin hired David Lanzotti to work at Allstar. Lanzotti convinced Furkin to buy gambling machines and to supply the machines to Allstar's customers in order to avoid being at a "competitive disadvantage." So, the lucrative gambling conspiracy began.

During the 1980's, Furkin purchased gambling machines with cash, using fictitious names, such as Lucky Coin. Neither Allstar's in-house accountant nor its outside accountant was aware of equipment purchases being made with cash. By 1991, Allstar had approximately 160 gambling machines at sixty-six different locations.

Lanzotti was the person primarily responsible for all aspects of the gambling machines' operations. He was the main proceeds "collector" for the gambling machines, and he often instructed other employees how to collect on the gambling machines. No records were generated to document the income from the gambling machines or to maintain an inventory of the machines. Marty Crosby, an Allstar employee who was trained by Lanzotti to collect on the gambling machines, testified at trial that Furkin told her not to generate any records and to destroy any paperwork pertaining to the gambling machines. Allstar stored records for the non-gambling machines on a computer program starting in 1985.

Furkin and Lanzotti, who both filed tax returns for the years in issue (1985 to 1994), knew that income had to be reported to the IRS. However, they filed their tax returns without reporting income from the gambling machines. Crosby testified that Furkin and Lanzotti had conversations during which they talked about not paying taxes on the gambling machine income. Also, in a tape-recorded conversation from December 22, 1992, Lanzotti indicated that he knew taxes were not being paid on the gambling machine income.

In 1991, Furkin and Lanzotti became aware that they were being investigated by the IRS. A grand jury subpoena was issued to Allstar in November 1991. Also in November 1991, the IRS sent letters to Furkin's customers disclosing the existence of the pending grand jury investigation. This greatly angered Furkin. Between thirty and one-hundred witnesses testified before the grand jury, including numerous Allstar employees and customers.

Furkin and Lanzotti were less than cooperative with the investigating authorities. Furkin made false statements to law enforcement agents. Both Furkin and Lanzotti encouraged bar owners to lie about how much income was generated by the gambling machines. Furkin instructed his employees, including Crosby and Gary Hinkle, to lie to the grand jury, and he had employee Merle Buerkett pressure bar owners to sign backdated leases which misrepresented when and how much income had been generated by the gambling machines. Furkin and Lanzotti made statements to various customers that the lease arrangements had a tax purpose or were necessary due to the IRS investigation.

On March 18, 1993, a search warrant was executed on Allstar's business premises. During the course of the search, law enforcement agents found an unregistered sawed-off shotgun in the closet of Furkin's office. A one-count indictment was returned on September 22, 1994, charging Furkin with possessing an unregistered sawed-off shotgun, 26 U.S.C. § 5861(d). A jury convicted Furkin of this charge on April 11, 1994.

Furkin was then charged in a seven-count superseding indictment returned on Novem-

ber 16, 1994. Count 1 charged conducting an illegal gambling business, 18 U.S.C. § 1955; Count 2 charged conspiracy to defraud the IRS, 18 U.S.C. § 371; Counts 3 and 4 charged witness tampering, 18 U.S.C. § 1512(b)(1); Count 5 charged obstruction of justice, 18 U.S.C. § 1503; Count 6 charged witness tampering, 18 U.S.C. § 1512(b)(2)(A); and Count 7 charged unregistered transactions in gambling devices, 15 U.S.C. §§ 1173(a)(3) and 1176. Count 6 was dismissed before trial. Furkin proceeded to trial on the remaining counts. At the close of the Government's case, he moved for a judgment of acquittal on Counts 2 and 7. The motion was denied. He was convicted by a jury of all counts except Count 4. On June 8, 1995, the district court granted Furkin's post-trial motion for a new trial on Count 1. The motion was granted. Counts 1 and 4 were dismissed on June 15, 1995. Furkin was sentenced on Counts 2, 3, 5 and 7. Following trial, the district court denied Furkin's motion for an acquittal and for dismissal of Count 5.

A joint sentencing hearing for both the gambling case and the gun case was held on December 4 and 5, 1995. Furkin was sentenced to 144 months' incarceration, to be followed by three years of supervised release; he was fined $250,000 plus the cost of incarceration; and he was ordered to pay $2,149,338 in restitution to the IRS. The lengthy prison sentence was the result of numerous adjustments under the Sentencing Guidelines plus an upward departure of two levels for egregious obstruction of justice. Final judgment was entered on December 8, 1995. Furkin appeals from both the gambling conviction and the gun conviction, claiming various errors by the district court at trial and at sentencing. Furkin also raises arguments relating to the sufficiency of the evidence on several counts.

## ANALYSIS

### I. Sufficiency of the Evidence Regarding Conspiracy to Defraud the IRS

■ Count 2 of the superseding indictment charged that, from 1985 to 1994, Furkin and Lanzotti conspired to defraud the United States "by impairing, obstructing and defeating the lawful function of the Internal Revenue Service ... to ascertain, compute, assess and collect income taxes," in violation of 18 U.S.C. § 371. This is commonly known as a *"Klein* conspiracy." *See United States v. Klein,* 247 F.2d 908 (2d Cir.1957), *cert. denied,* 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958). To sustain a conviction for conspiring to defraud the IRS, "the government has the burden of proving three elements under § 371:(1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, *i.e.,* to defraud the United States." *United States v. Cyprian,* 23 F.3d 1189, 1201 (7th Cir.), *cert. denied,* 513 U.S. 879, 115 S.Ct. 211, 130 L.Ed.2d 139 (1994) (citation omitted). The "intent" element of § 371 requires the government to prove "not that the conspirator was aware of the criminality of the objective, but that the conspirator knew of the liability for federal taxes." *Cyprian,* 23 F.3d at 1201 (internal quotations and citation omitted). The parties' intent, as well as their agreement, may be inferred from circumstantial evidence concerning the relationship of the parties, their overt acts, and the totality of their conduct. *United States v. Marren,* 890 F.2d 924, 933 (7th Cir.1989).

■ Furkin concedes that the evidence was sufficient to establish that he, alone, defrauded the IRS. His argument focuses, rather, on the lack of evidence as to Lanzotti's involvement in Furkin's scheme. According to Furkin, the only conduct Lanzotti intended to engage in, agreed to engage in, and in fact engaged in, related to illegal gambling activities. He contends that Lanzotti simply collected the proceeds of the illegal gambling operation and turned in the proceeds to the appropriate personnel at Allstar, while having no idea that the income was not being reported to the IRS. It takes two to conspire—a conspiracy is "a combination or confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act," *United States v. Durrive,* 902 F.2d 1221, 1225 (7th Cir.1990) (citations omitted)—so, the argument goes, if Lanzotti cannot be linked to the

scheme, Furkin could not have been involved in a *Klein* conspiracy. The guilty verdict must then be set aside.

■ We review the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the Government, and we will affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Jackson*, 103 F.3d 561, 567 (7th Cir.1996). Only when the record contains no evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt will a jury verdict be overturned. *United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996).

The Government clearly met its burden of proving the three elements under § 371 as to Lanzotti. The evidence showed that Furkin and Lanzotti had a strong business relationship—they were business associates since the early 1980's. The evidence also showed that Lanzotti was the one who convinced Furkin to enter into the illegal gambling market. Lanzotti was primarily responsible for all aspects of the gambling machines' operations. He was the main collector for Allstar's share of the proceeds from the machines, and he trained other employees how to collect. Lanzotti did not generate records documenting the income from the gambling machines. Indeed, no one created records documenting the income from, or maintained any inventory of, the gambling machines. The absence of records obviously made it impossible for the IRS to ascertain, compute, assess or collect Allstar's income taxes.

The evidence also showed that both Lanzotti and Furkin made extensive efforts to hide the income from the gambling machines. Lanzotti knew that, in the 1980's, Furkin purchased gambling machines with cash using fictitious names. Lanzotti was also aware that Furkin was not reporting the illegal gambling income to the IRS. Both Lanzotti and Furkin knew that income had to be reported to the IRS. They both filed tax returns. Marty Crosby testified that Furkin and Lanzotti had conversations in which they discussed not paying taxes on the gambling machine income. During a December 1992 tape-recorded conversation, Lanzotti indicated that he was aware taxes were not being paid on the gambling machines' income. He also agreed that legalizing gambling machines would do away with unreported income.

In 1991, after becoming aware that they were being investigated by the IRS, Furkin and Lanzotti encouraged bar owners to lie about how much income they received from the gambling machines. They also began entering into backdated lease agreements which misrepresented when and how much income had been received from the gambling machines. The leases purportedly required the bar owners to pay Allstar a flat rate per machine each week. Allstar never collected the flat rate. Instead, Allstar split equally the gross earnings from the illegal gambling activities with each particular tavern owner. The flat rate was less than half the gross earnings, so the practical effect of the arrangements was to grossly underestimate Allstar's unreported income that was derived from the gambling machines. In other words, the backdated leases were intended to lead the IRS to believe that Allstar failed to report less income than it actually failed to report. If Allstar had succeeded in the scam, it would have been liable to the IRS for a lesser amount of unpaid income taxes.

Moreover, Furkin and Lanzotti told the tavern owners that the lease arrangements had a tax purpose or were needed because of the IRS investigation. Lanzotti told Nile Beebe of the VFW, a gambling machine customer of Allstar, that Allstar needed a lease agreement for "tax purposes." Lanzotti told bar owner David Hampsten that Allstar needed a lease agreement because "the Government was on his ass." Furkin also told tavern owner George Johnson that Allstar needed a lease agreement because he was being investigated by the IRS.

■ A review of the evidence in its totality shows that tax evasion was at least one of the motivations behind Furkin's and Lanzotti's actions. "A conspiracy ... may have multiple objectives, and if one of its objectives, even a minor one, be the evasion of federal

taxes, the offense is made out, though the primary objective may be concealment of another crime." *Ingram v. United States,* 360 U.S. 672, 679–80, 79 S.Ct. 1314, 1319–20, 3 L.Ed.2d 1503 (1959) (citation omitted). No doubt Lanzotti's conduct was undertaken to hide Allstar's involvement in the illegal gambling market, but it is equally reasonable to infer that Lanzotti's conduct was also undertaken to hide Allstar's illegal gambling income from the IRS.

In sum, the evidence at trial established Lanzotti's intent and agreement to become involved in Furkin's scheme. Lanzotti was not only aware of Allstar's tax liability, but he was also aware that his conduct in relation to the illegal gambling operation would impede the IRS's ability to ascertain Allstar's tax liability.

 As an ancillary argument, Furkin maintains that even if the evidence is sufficient to establish a *Klein* conspiracy, the conduct serving as the basis for the conspiracy began in 1991, not 1985. Furkin asks to be resentenced for a conspiracy beginning in 1991. The district court noted in its September 18, 1995 order that whether the conspiracy began in 1985 or 1991 is immaterial to the question of whether the evidence was sufficient to support the conspiracy conviction. So long as the evidence supports the conspiracy during any relevant time period, the conviction will be sustained. *United States v. Jackson,* 935 F.2d 832, 844 (7th Cir.1991). The length of the conspiracy is relevant only for sentencing purposes in this case. The computation of Furkin's offense level de-

pends upon the total amount of the tax loss resulting from the conspiracy. When only sentencing issues are implicated, the district court determines the duration of a conspiracy under a preponderance of the evidence standard. *United States v. Williams,* 81 F.3d 1434, 1442–43 (7th Cir.1996).

Based on our discussion above, we believe that the district court was correct in finding that the conspiracy between Furkin and Lanzotti began as early as 1985. Furkin and Lanzotti maintained a strong business relationship since the early 1980's, Lanzotti was primarily responsible for the operation of the illegal gambling machines from the inception of the gambling business, and Lanzotti did not record the income earned from the illegal gambling machines prior to 1991. It is thus reasonable to infer that Lanzotti was aware as early as 1985 that Furkin was not reporting the illegal gambling proceeds to the IRS. We reject Furkin's sufficiency of the evidence argument in its entirety.[1]

## II. Obstruction of Justice

 Furkin was convicted of violating 18 U.S.C. § 1503's "Omnibus Clause," which is a catch-all provision prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice. In order to establish a violation of the Omnibus Clause, there must be a nexus between a defendant's efforts and the judicial proceeding (in this case, the grand jury investigation) sought to be corruptly influenced. *United States v. Aguilar,* 515 U.S. 593, 598–99, 115 S.Ct. 2357, 2362, 132 L.Ed.2d 520

---

1. We briefly address one other issue Furkin raises concerning Count 2. Furkin was held liable for both corporate and personal income tax on Count 2. On Count 7, he was held personally liable for corporate failure to register gambling devices in violation of 15 U.S.C. § 1173(a)(3). Furkin argues that it is inconsistent to treat the corporation as significant for calculating tax loss, but insignificant for purposes of determining liability under the registration statute.

 Furkin's breach of the registration statute has nothing to do with the computation of tax liability. The rules for determining liability under the statute are different from those that govern the calculation of tax loss. The evidence at trial was sufficient to establish that Furkin bought, received, and sold gambling devices on behalf of Allstar and himself without registering with the

 Attorney General as required by 15 U.S.C. § 1173(a)(3). As for computing the tax loss resulting from the conspiracy, the district court applied the method outlined in *United States v. Harvey,* which requires that "[w]hen a single transaction bypasses both corporate and personal taxes, any effort to determine the 'tax loss' must include both." 996 F.2d 919, 920 (7th Cir.1993). Allstar's employees serviced and collected from the gambling machines. The actions of these employees generated corporate gross earnings, which, of course, generated corporate tax liability. Furkin, as owner of Allstar, also incurred personal tax liability. His crimes "cause[d] two taxpayers [himself and Allstar] to understate their income and pay less to the Internal Revenue Service." *Id.* at 921.

(1995). In other words, "the act must have a relationship in time, causation or logic with the judicial proceedings.... [T]he endeavor must have the 'natural and probable effect' of interfering with the due administration of justice." *Id.* (quotations and citations omitted). This means that the Government was required to show that Furkin knew of the pending grand jury investigation and intended to impede its administration. *United States v. Maloney,* 71 F.3d 645, 656 (7th Cir.1995).

Count 5 of the superseding indictment charged Furkin with corruptly endeavoring to influence, obstruct, or impede the due administration of justice by four separate means. The jury was given special verdicts as to those separate means, and the jury returned guilty verdicts as to two of them. The jury found that Furkin had violated § 1503 "by causing another to get businesses and organizations at which Allstar had its electronic video gaming machines to enter into lease agreements and have such leases backdated," and "by continuing to split the proceeds from gambling on the electronic video gaming machines even after some locations had signed a lease by which they agreed to pay a fixed weekly or monthly rate for such gaming machines."

■ Furkin argues that none of the conduct for which the jury convicted him (specifically, causing Merle Buerkett to get businesses to enter into backdated leases and continuing to split the proceeds from gambling machines after agreeing to a fixed rate) evidences a nexus with the grand jury investigation. He cites *Aguilar* for the principle that "[t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the Court's or grand jury's authority." 515 U.S. at 599, 115 S.Ct. at 2362 (citation omitted). Furkin points out that Buerkett never testified that Furkin told him to submit false or backdated lease agreements to the grand jury. According to Furkin, even if he had convinced businesses to enter backdated lease agreements, at most, this shows that the backdated leases were obtained for possible use in the IRS investigation, not in the grand jury proceedings.

Furkin's argument is basically a sufficiency of the evidence argument. We will reverse a conviction for insufficient evidence only if, after viewing the evidence in the light most favorable to the Government, we determine that no rational jury could have found the defendant guilty beyond a reasonable doubt. *Maloney,* 71 F.3d at 656 (citation omitted).

■ If the defendant lacks knowledge that his actions are likely to affect a judicial proceeding, he lacks the requisite intent to obstruct. *See Aguilar,* 515 U.S. at 598–600, 115 S.Ct. at 2362. A grand jury subpoena was issued to Allstar in November 1991. Furkin knew that the investigation was ongoing after that time. Clearly, a judicial proceeding was pending and Furkin knew about it as early as 1991.

Furkin was also aware that the IRS was integrally involved in the grand jury investigation. "[I]nvestigations undertaken with the intention of presenting evidence before a grand jury are sufficient to constitute 'the due administration of justice' under § 1503." *Maloney,* 71 F.3d at 657 (citation omitted). Furkin knew that the grand jury was seeking evidence regarding Allstar's relationships with various bar owners and that the evidence sought pertained to income taxes. Numerous Allstar employees and customers were subpoenaed to testify. George Johnson, an Allstar customer, testified at trial that several weeks before he testified before the grand jury, Furkin said he was being investigated by the IRS and wanted Johnson to lie to the grand jury about his lease agreement with Allstar. At trial, Buerkett testified that Furkin told him that he was being scrutinized by the IRS. IRS agent Vonnie Hinesley testified that Furkin was very upset that his customers had been informed by the IRS that he was being investigated by a federal grand jury for possible federal tax violations. In May of 1992, Furkin persuaded bar owners Johnson and Louie Manci, Jr. to sign backdated leases, when he knew that they would be testifying before the grand jury. Furkin had a tax motivation for backdating the leases, and Furkin knew that information regarding the leases was part of

the evidence sought by the grand jury. The IRS investigation was not some "ancillary proceeding" unrelated to the grand jury investigation. Indeed, the IRS investigation and the grand jury investigation were one and the same, and the evidence established that Furkin understood this fact.

The evidence also established that Furkin intended to impede the administration of the investigation by directing Buerkett to induce numerous bar owners to sign backdated leases. For Furkin to be guilty of violating § 1503, Buerkett need not have specifically and explicitly testified that the purpose of backdating the leases was connected to the grand jury investigation. The jury could make that connection from considering the evidence as a whole. Furkin's conduct in relation to Buerkett was sufficient to justify a guilty verdict under § 1503 because the conduct had the "natural and probable effect" of interfering with the grand jury investigation.

### III. Upward Departure

■ Furkin next claims that the district court erred at sentencing when it departed upward two levels from the applicable guideline range. Specifically, Furkin argues that the court failed to analyze whether his case was outside the "heartland" of conspiracy to impede the IRS cases. We review for abuse of discretion. *Koon v. United States,* — U.S. —, —, 116 S.Ct. 2035, 2043, 135 L.Ed.2d 392 (1996); *United States v. Otis,* 107 F.3d 487, 490 (7th Cir.1997).

Generally, a district judge must impose a sentence falling within the applicable guideline range. A sentencing court may depart from the guideline range if "the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)). In addressing the meaning of § 5K2.0, the Supreme Court in *Koon* explained that "the Commission did not adequately take into account cases that are, for one reason or another, 'unusual.'" *Koon,*

— U.S. at —, 116 S.Ct. at 2044. The Introduction to the Sentencing Guidelines states:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. ch. 1, pt. A, intro. comment. 4(b). So, in considering whether to depart, a sentencing court should ask the following questions:

> 1) What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?
>
> 2) Has the Commission forbidden departures based on those features?
>
> 3) If not, has the Commission encouraged departures based on those features?
>
> 4) If not, has the Commission discouraged departures based on those features?

*Koon,* — U.S. at —, 116 S.Ct. at 2045 (quoting *United States v. Rivera,* 994 F.2d 942, 949 (1st Cir.1993)).

■ Furkin complains that the district court failed to follow this framework. He argues that instead of comparing his case to a class of cases within the heartland of his offense, the court discussed the issue of a departure in terms of generalities.

To be in line with *Koon,* Furkin's conduct after he was aware of the IRS investigation "must be sufficiently unusual either in type or degree 'to take the case out of the Guideline's heartland.'" *Otis,* 107 F.3d at 490 (quoting *Koon,* 116 S.Ct. at 2045). The district court cited two independent reasons for the upward departure. The first relates to the extent and egregiousness of Furkin's obstructive conduct. U.S.S.G. § 3C1.1 called for a two-level increase in Furkin's offense level for obstruction of justice. The court felt a two-level enhancement in this particular case was "grossly inadequate" to reflect the outrageousness of Furkin's conduct. The court stated in review:

> [Furkin] instructed Louis Manci to lie in front of the grand jury; he instructed

George Johnson to lie in front of the grand jury; he instructed Merle Buerkett to convince the tavern owners to sign back-dated leases; he instructed Bud Kelly to persuade particular locations to sign back-dated leases; he instructed Gary Hinkle to tell anyone that asked that the gambling machines were on a lease and he intimidated Hinkle and told Hinkle not to do anything in front of the grand jury that would hurt him; and he instructed Marty Crosby on how to lie in front of the grand jury. The court went on to state that "Furkin's conduct was far more severe than the ordinary case where the obstruction of justice enhancement applies. Indeed, this Court has never witnessed such an attempt to thwart the judicial process." As an alternative basis for the departure, the court found that Furkin was hiding assets—the fruits of the illegal gambling business. Millions of dollars were, and continue to be, unaccounted for.

The egregiousness of Furkin's conduct in obstructing justice and hiding millions of dollars in assets take this case outside the heartland of conspiracy to defraud the IRS cases. *See United States v. Jagim,* 978 F.2d 1032 (8th Cir.1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2447, 124 L.Ed.2d 664 (1993) (holding that extent and egregious nature of obstruction of justice can support an upward departure); *United States v. Baez,* 944 F.2d 88 (2d Cir.1991) (same); *United States v. Wade,* 931 F.2d 300 (5th Cir.), *cert. denied,* 502 U.S. 888, 112 S.Ct. 247, 116 L.Ed.2d 202 (1991) (same). These are not factors for which the Commission has forbidden, encouraged or discouraged departure. U.S.S.G. § 5K2.0 allows a sentencing court to depart from the applicable guideline range "even though the reason for departure is taken into consideration in the guidelines (*e.g.,* as a specific offense characteristic or other adjustment), if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate." That is exactly what the district court explicitly determined to be the case here. Application Note 3 to U.S.S.G. § 3C1.1 provides nine examples of types of conduct, any one of which justifies a two-level increase for obstruction of justice. Furkin committed eight of the nine types of conduct listed, and some of the conduct he committed multiple times.

The facts of this case establish that Furkin's egregious obstruction of justice and concealment of assets make this an unusual case. The district court did not abuse its discretion in departing upward from the applicable guideline range.

## IV. Sophisticated Means, Obstruction of Justice and Upward Departure

■ Furkin next contends that, in calculating his sentence, the district court impermissibly took into account multiple times his conduct in obstructing the IRS investigation. He argues that Count 2, conspiracy to impede the IRS, Count 3, witness tampering, Count 5, obstruction of justice, and Count 7, unregistered transactions in gambling devices, were directly related to his attempts to avoid detection and prosecution or had the "effect of covering up activities." According to Furkin, factoring the conduct underlying these charges into not only his base offense level for the *Klein* conspiracy, but also into the "sophisticated means" specific offense characteristic, the role in the offense adjustment, and the upward departure constitutes impermissible multiple-counting.

Furkin is correct that there is a certain amount of overlap among various factors as they relate to sophisticated means, obstruction of justice, departure, as well as the guideline for the underlying conspiracy. However, as the Government points out, the base offense level for a *Klein* conspiracy, the various enhancements, and the departure each represent different considerations under the Guidelines.

The sophisticated means enhancement relates to the complexity of a defendant's scheme. U.S.S.G. § 2T1.4 (b)(2) instructs the sentencing court to increase the defendant's offense level by two levels "[i]f sophisticated means were used to impede discovery of the existence or extent of the offense." The enhancement targets

> conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case. An enhancement would be applied, for example, where the defendant used offshore bank accounts or transactions through corporate shells or fictitious entities.

U.S.S.G. § 2T1.1, comment. (n.4); U.S.S.G § 2T1.4, comment. (n.3). The sophisticated

means enhancement in this case was based on Furkin's conduct relating to the everyday operation of the business, such as using fictitious names, failing to keep records concerning income, destroying records, using cash to buy equipment, failing to tell Allstar's accountants of the cash purchases, and failing to keep an inventory of equipment.

By contrast, the obstruction of justice enhancement relates to efforts taken to subvert the administration of justice during the investigation, prosecution and sentencing of an offense. U.S.S.G. § 3C1.1 directs a sentencing court to increase the defendant's offense level by two levels "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense...." Application Note 3 to the section provides a nonexhaustive list of examples of types of conduct to which the enhancement applies. As noted *supra*, Furkin committed eight of the nine types of listed conduct that qualify for the obstruction of justice enhancement. For example, after Furkin learned of the grand jury investigation, he lied to the IRS and caused others to do so, he caused others to lie to the grand jury, he failed to produce records which had been subpoenaed, and he created false documents to be turned over to the IRS and to the grand jury.

In further contrast is the adjustment for Furkin's role in the offense. U.S.S.G. § 3B1.1 "provides a range of adjustments to increase the offense level based upon the size of a criminal organization (*i.e.*, the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense." U.S.S.G. § 3B1.1, comment. (backg'd). The sentencing court is directed to increase the defendant's offense level by four levels if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In order to show the extent of, and Furkin's role in, the organization, the district court needed to identify the actions taken in furtherance of the organization by Furkin as well as by various other people. The court considered evidence of Furkin's conduct in instructing at least six others to destroy records, backdate leases, and omit income on corporate books.

Granted, this conduct was also considered when other enhancements were applied, but for purposes of § 3B1.1, the conduct was referenced only to establish why others should be included in the organization.

Finally, the upward departure in this case relates to Furkin's concealment of assets and the egregiousness and extent of Furkin's efforts to obstruct justice. The departure was warranted by the number of such activities and the number of different people Furkin caused to participate in such activities, as discussed in part III of this Opinion. The focus was on Furkin's conduct, as opposed to his employees' or his customers' conduct.

Again, we acknowledge that the district court mentioned some of the same factors in connection with the different adjustments and the departure. However, it was not error to do so, as the different guidelines address different concerns relating to a defendant's obstructive conduct.

## V. Wiley Moore's Failure to Testify

Finally, Furkin contends that he should have been granted a new trial in the gun case because the Government presented a witness whom it knew or should have known would refuse to testify upon taking the witness stand. The Government called to the stand Wiley Moore, an Allstar employee for two years. Although the Government knew that Moore was apprehensive, the Government believed that he would testify. Moore managed to answer several background questions, but then he stated: "I had a conversation earlier with [the prosecutor] about testifying." At that time, the attorneys approached the bench, and the jury was excused. Outside the presence of the jury, Moore explained that he would not testify because he was afraid of Furkin. Moore gave no further testimony in the case. The record also indicates that, outside the presence of the jury, the sentencing court stated that based upon its observations in open court, it believed Moore refused to testify because he was afraid of Furkin.

Furkin filed a post-trial motion seeking a new trial based upon Moore's appearance and failure to testify. The district court denied the motion, ruling that the jury could not have drawn an adverse inference against Furkin by Moore's appearance and failure to

complete his testimony. Furkin claims that he was prejudiced by Moore's appearance and failure to complete his testimony because "[s]urely the jury picked up the same vibes as the court, rendering Moore's testimony harmful to [Furkin]." This argument was not raised in the district court, so our review is for plain error. *United States v. Funches,* 84 F.3d 249, 254 (7th Cir.1996) (citation omitted).

We find no error here. Moore never refused to testify in the presence of the jury. The district court was in the best position to determine whether Moore's testimony created an adverse inference against Furkin in the jury's mind. The court concluded that no such inference was created, and that conclusion is not plain error.

## CONCLUSION

For the foregoing reasons, Furkin's convictions and sentence are AFFIRMED. Furkin's other arguments have been waived or are otherwise without merit.