In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2577

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRIAN WASSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 CR 20055—**Michael P. McCuskey**, *Judge.*

ARGUED MAY 3, 2011—DECIDED MAY 21, 2012

Before ROVNER and WILLIAMS, *Circuit Judges,* and
YOUNG, *District Judge.*[*]

ROVNER, *Circuit Judge.* Brian K. Wasson was convicted
after a bench trial of one count of conspiracy to defraud
the United States, *see* 18 U.S.C. § 371, and six counts of

[*] The Honorable Richard L. Young, Chief District Judge for
the United States District Court for the Southern District of
Indiana, sitting by designation.

aiding in the filing of a false tax return, *see* 26 U.S.C. § 7206(2). He was sentenced to a total of 180 months' imprisonment to be followed by three years of supervised release. Wasson appeals, arguing that the district court erred by denying his motion to dismiss the indictment because he did not receive a speedy trial. He also challenges the sufficiency of the evidence and claims that his sentence violates the ex post facto clause of the Constitution.

## I.

Wasson's conviction stems from his involvement with a more extensive tax fraud conspiracy involving the now defunct The Aegis Company.[1] The Aegis Company was founded in Palos Hills, Illinois. Aegis promoted and sold "trusts" to wealthy taxpayer clients, promising them asset protection and reduced tax liability. These trusts, which were essentially shams, were used to divert the clients' taxable income, thereby reducing or eliminating liability for the taxpayer client. Sometime in 1997, Wasson and his codefendant Joseph Starns

---

[1] In addition to Wasson and his codefendant Starns, a number of other Aegis officials were convicted of tax fraud in the Northern District of Illinois. Their criminal appeals are currently pending before this court. *United States v. Vallone, et al.*, No. 08-3690; *see also* "Six Principals of Former Aegis Company Convicted of $60 million tax fraud conspiracy following three-month federal trial," U.S. Dep't of Justice, May 19, 2008 *available at* www.usdoj.gov/usao/iln.

founded "Midwest Alternative Planning" in Danville, Illinois. They used this business to market the Aegis trust scheme. Starns introduced the Aegis system to the third codefendant, John Wolgamot, who was an attorney in Danville. Wolgamot assisted by preparing the trust entities for Wasson and Starns's clients.

Generally clients paid between $20,000 and $40,000 to set up the trusts under the Aegis system and an additional annual "financial planning" or "management" fee of between $3,000 and $7,000. For example, one Aegis client, Dennis Frichtl, paid approximately $20,000 to set up a domestic and two "offshore charitable" trusts into which he transferred his business profits. Frichtl owned his own welding business and made between $3 and $4 million annually in gross sales. He was told to transfer the money from the first to the second trust and finally to the third, offshore trust, which he was told had no IRS reporting requirements. Using this method, he went from paying between $20,000 and $25,000 annually in taxes to paying no income tax. He later sold his business for $5.2 million, and Wasson assisted him in wiring the profit from the sale overseas into an account that could still be accessed by Frichtl's personal credit card.

In March 2000, the Internal Revenue Service Criminal Investigation Division executed a search warrant on the Aegis offices in Palos Hills. Subsequently, Wasson and others continued marketing the Aegis trusts, despite ongoing investigation by the IRS and the fact that multiple Aegis participants had by this time begun re-

ceiving requests for audits. In May 2003, the FBI executed search warrants on the Aegis offices and the residence of top Aegis official Michael Vallone. All told Wasson, Starns, and Wolgamot assisted at least twelve taxpayers using the Aegis system to conceal millions of dollars in income from the IRS. They received over $350,000 in fees and commissions and caused a tax loss to the United States of approximately $6 million.

As we will discuss in more detail below, the path to trial for Wasson was a long one. It began in September 2006, when he was charged in an initial indictment with aiding in the filing of a false tax return in violation of 26 U.S.C. § 7206(2). The grand jury then twice superseded the indictment in order to add Starns and Wolgamot as defendants, include additional counts under § 7206(2), and charge all three defendants with conspiracy to defraud the IRS in violation of 18 U.S.C. § 371. The third superseding indictment was returned on May 2, 2007.

In the interim between the first and third indictments, the district court granted a motion by Wasson to continue and also entered a finding in January 2007 that the case was complex. In so finding, the court granted the government's unopposed request for a finding of complexity. The parties and the court acknowledged the "paper-intensive" nature of tax cases generally and the complex nature of this case specifically: the court noted in particular that the charges involved a conspiracy with multiple defendants as well as multiple taxpayers' returns. Accordingly, the court concluded

that the ends of justice warranted excluding time until May 1, 2007. *See* 18 U.S.C. § 3161(h)(7)(A). At the status hearing on May 1, Starns moved to appoint counsel, and the government informed the court that it would be returning a third superseding indictment the following day and adding a third defendant (Wolgamot). To accommodate Starns's new counsel and Wolgamot's future counsel's need to familiarize him or herself with the case, the court made another ends-of-justice finding and excluded time until a scheduled hearing on July 17, 2007.

Following the return of the third superseding indictment, Wasson moved on June 8, 2007 to continue trial. On June 28, the court ruled on Wasson's motion and continued trial until March 31, 2008. At that time, the court "reaffirmed" its previous finding that the case was complex and again excluded time under the ends-of-justice exception, *see* 18 U.S.C. § 3161(h)(7)(A). Starns's counsel also informed the court that Starns had been diagnosed with cancer. Starns subsequently passed away in August 2007.

On January 14, 2008, Wasson—joined by Wolgamot—again moved to continue the trial. On February 7, the court granted Wasson's motion, vacated the March trial date, and reset the trial to September 22, 2008. The court repeated its ends-of-justice finding, *see* 18 U.S.C. § 3161(h)(7)(A), and excluded time until the September trial date.

Before the September date arrived, the government moved to continue. This time the motion was based on

Wolgamot's guilty plea, which the government suggested changed the landscape of the case such that more preparation time was necessary. Government counsel also requested the continuance to ensure "continuity of government counsel" because he was participating for up to six months in a detail in Washington, D.C. related to the Guatanamo Bay detainee litigation. After noting the likelihood that Wasson would have himself been seeking a continuance due to the "changing complexity" of the case, the court continued the trial until March 2, 2009.

Before trial commenced on March 2, Wasson moved to dismiss the indictment for failure to comply with the Speedy Trial Act. *See* 18 U.S.C. §§ 3161-74. The district court denied Wasson's motion, noting that there had been specific reasons supporting each continuance and that in each instance it had balanced the ends of justice against the interests of the parties and the public. The court also observed that the parties had agreed from the beginning that it was a complex case, and that Wasson had either requested or agreed to every continuance between his indictment and the scheduled trial on March 2, 2009.

During the 12-day bench trial, the government presented numerous witnesses and close to 1,000 documentary and summary exhibits. Wolgamot testified pursuant to his guilty plea about his involvement in preparing the trust documents for Aegis clients. Eleven taxpayers who had purchased the Aegis system testified, and the court also heard from four IRS agents

who had worked on the case. Wasson maintained throughout trial that he had a good-faith belief in the legality of the Aegis system, and elicited testimony from various government witnesses that he had consistently defended its legality in his interactions with both the government and his clients. The district court denied Wasson's oral motion for a judgment of acquittal on March 17, 2009.

The district court found Wasson guilty on all charges in December 2009. Between the conclusion of trial and the court's verdict, the parties obtained and reviewed trial transcripts and presented written closing arguments to the court. The court rejected Wasson's good-faith defense and concluded that the evidence of Wasson's guilt was "overwhelming." The court also denied Wasson's renewed motion (filed pro se) to dismiss the indictment based on the alleged speedy trial violation.

Wasson then renewed his motion for acquittal and moved for a new trial, arguing that the court had erred with its preliminary finding (before trial) that a conspiracy existed, thereby allowing inadmissible hearsay into evidence at trial that prejudiced him. The court denied both motions. Specifically, the court rejected Wasson's contention that he lacked the intent to defraud the United States. It also concluded that the evidence presented at trial was "more than sufficient to establish the existence of a conspiracy."

Over Wasson's objection, the district court calculated his advisory guideline range using the 2008 Sentencing

Guidelines Manual instead of the manual in existence when Wasson committed his crimes. The court then sentenced Wasson to 180 months—a term of imprisonment in the middle of the 168- to 210-month advisory guideline range. The court believed such a lengthy term of imprisonment appropriate in light of the "extensive, orchestrated" nature of the Aegis scheme and the need "to deter others from violating the tax laws."

After the district court imposed its sentence, Wasson twice moved for bond pending appeal, arguing that the alleged violation of the Speedy Trial Act constituted a substantial question of law warranting his release. The district court denied his motion, reiterating for the third time its belief that the periods of delay were excludable and that the question was not a close one. This court, too, denied Wasson's motion for bond.

## II.

On appeal, Wasson argues primarily that the district court erred by denying his motions to dismiss the indictment under the Speedy Trial Act. *See* 18 U.S.C. §§ 3161-74. We review the district court's legal interpretations of the Act de novo, and its decisions to exclude time for an abuse of discretion. *See, e.g., United States v. Hills*, 618 F.3d 619, 625 (7th Cir. 2010). Unless the defendant shows legal error, we will reverse the district court's decision to exclude time only where the defendant can show both an abuse of discretion and actual prejudice. *Id.; see also United States v. Broadnax*, 536 F.3d 695, 698 (7th Cir. 2008) ("[E]xclusions of time cannot be reversed

except when there is an abuse of discretion by the court and a showing of actual prejudice.").

Generally speaking, the Act requires a federal criminal trial to commence within 70 days after the defendant is charged or makes an initial appearance, whichever occurs later. 18 U.S.C. § 3161(c)(1). However, in recognition of the realities of widely varying and potentially complex criminal trials, the Act sets forth a number of allowable delays that may be excluded from the seventy-day clock. 18 U.S.C. § 3161(h); *see also United States v. Zedner*, 547 U.S. 489, 497-98 (2006).

The one exclusion relevant to Wasson's appeal is § 3161(h)(7)(A), which provides that the following periods of delay should be excluded:

> Any period of delay resulting from a continuance . . . if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(7)(A).

Section 3161(h)(7)(B) also sets forth four nonexhaustive factors which the court "shall consider" in determining

whether to grant an ends-of-justice continuance. In particular, subsection (7)(B)(ii) directs the judge to consider "[w]hether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section." As detailed above, the district court relied on the ends of justice and the complex nature of the case when it repeatedly continued Wasson's trial date.

The parties agree that the speedy trial clock began running when Wolgamot was arraigned on May 11, 2007. It is also undisputed that between that date and the commencement of trial on March 2, 2009, 224 days were automatically excluded for the handling of the defendants' fourteen pretrial motions. *See* 18 U.S.C. § 3161(h)(1)(D) (excluding delay "resulting from any pretrial motion" from its filing through its disposition); *Hills*, 618 F.3d at 626-27 (upholding automatic excludability of time between filing and resolution of pretrial motions). That leaves the continuances granted by the district court, which resulted in a total of 437 remaining days between the commencement of the speedy trial clock and Wasson's trial.

Although Wasson's opening brief singles out three continuances granted by the district court, his reply brief makes clear that he is ultimately challenging only the two granted on February 7, 2008 (excluding time between

February 7 and September 22, 2008) and August 22, 2008[2] (excluding time between August 22, 2008 and March 2, 2009). The district court granted the February 7 continuance in response to Wasson's motion, where he cited the complex nature of the case and the voluminous government disclosure to be reviewed—specifically 75,000 pages in paper documents, a computer hard drive containing over one million documents, and dozens of hours of recordings. He represented that given the state of discovery he could not be adequately prepared for trial. The government did not oppose Wasson's motion. In a minute entry for the proceedings on Wasson's motion, the court grants it with the unelaborated conclusion that "the ends of justice have been met" pursuant to 18 U.S.C. § 3161(h)(7)(A). The August 22, 2008 continuance was granted in response to the government's oral motion, made the day after Wolgamot pleaded guilty. In support of its motion, the government cited the complexity of the case and the desire to ensure continuity of government counsel in light of the impending six-month detail in Washington, D.C. Wasson's counsel added that Wolgamot's plea "profoundly affects our case" and that going to trial in several weeks would be "very difficult." After ensuring that Wasson himself had no objection to the continuance and remarking that a long trial in January

---

[2] Wasson's reply brief actually refers to a continuance granted August 28, 2008, but it is clear from the context of his argument and the district court's docket sheet that he intended to reference August 22.

or February would be problematic on account of the weather, the court granted the continuance and set trial for March 2, 2009. The court found the period of delay to be excludable based on its previous finding that the case was complex and stated that "the ends of justice are served by taking this action which outweighs the best interests of the public and the defendant."

As detailed above, there are two statutory prerequisites for excluding a continuance from the Act's 70-day time limit. First, the court must find that the ends of justice served by granting the continuance "outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7). Second, time "shall" not be excludable unless the court "sets forth, in the record . . . its reasons for finding that the ends of justice" outweigh the interest of the public and the defendant in a speedy trial. *Id.* In light of these statutory requirements, Wasson argues that the delays may not be excluded under the Act because the district court failed to make explicit contemporaneous findings on the record justifying the continuances. The government responds that, taken together with the sequence of events culminating in the continuances, the district court's findings accompanying each continuance suffice under the Act. The requirement of express findings is the "procedural strictness" that counteracts the "substantive open-endedness" of the ends-of-justice provision. *Zedner*, 547 U.S. at 509.

Wasson's argument boils down to his insistence that to satisfy the Act, the district court's findings must

be both explicit and contemporaneous with the granting of an excludable continuance. But although the Act specifies the need to make findings "in the record," it does not spell out precisely *how* the court must effectuate this. Wasson relies heavily on *Zedner* to support his claim that neither implicit nor after-the-fact findings will support an ends-of-justice continuance. But Wasson overreads *Zedner*. In *Zedner*, the Supreme Court concluded that the Act does not permit a defendant to prospectively waive its application. At the district court's urging, the defendant in *Zedner* had signed a preprinted waiver form purporting to waive his speedy trial rights "for all time." *Zedner*, 547 U.S. at 493-94. In rejecting the efficacy of the defendant's waiver, the Court clarified the Act's requirement for express findings to support a § 3161(h)(7) continuance.

Specifically, the government in *Zedner* had argued that although the district court had never entered an express finding on the record, such a finding could be entered on remand because the circumstances at the time in fact supported the continuance under the ends-of-justice factors. *Zedner*, 547 U.S. at 506. The Court rejected that argument, pointing out that "[i]n the first place, the Act requires express findings, and in the second place, it does not permit those findings to be made on remand as the Government proposes." *Id.* The Court noted the ambiguity that exists between (1) the Act's clear requirement that the court must make findings "if only in the judge's mind," before granting the continuance, and (2) its duty to set those findings forth "in the record of the case." *Id.* at 506-07 (citing

what is now codified as 18 U.S.C. § 3161(h)(7)(A)). Without conclusively resolving the ambiguity, the Court noted that "at the very least the Act implies that those findings must be put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2)." *Id.* at 507.

Wasson seizes on this passage to support his claim that the district court must consider the ends-of-justice factors contemporaneously with each continuance granted. *Zedner* certainly supports his claim that the court must balance the factors at the time it grants the continuance; but *Zedner* does not go so far as to say this balancing must be memorialized at that time. It recognizes that "[t]he best practice, of course, is for a district court to put its findings on the record at or near the time when it grants the continuance." 547 U.S. at 507 n.7. Although this is undoubtedly the "best practice," it is not the *only* permissible practice. *Zedner* and its progeny support our interpretation that a court's ends-of-justice findings need not be articulated contemporaneously on the record. *See Hills*, 618 F.3d at 628 (court need not articulate its findings contemporaneously with exclusion of time).

Instead we must assure ourselves that the court's reasons have been articulated by the time it rules on a defendant's motion to dismiss and that those reasons satisfy § 3161(h)(7). *Id.* "'The requirement that the district court make clear on the record its reasons for granting an ends-of-justice continuance serves two core purposes. It both ensures the district court considers

the relevant factors and provides this court with an adequate record to review.'" *United States v. Napadow*, 596 F.3d 398, 405 (7th Cir. 2010) (quoting *United States v. Toombs*, 574 F.3d 1262, 1269 (10th Cir. 2009)).

In *Napadow*, we concluded that despite minute entries that were "clearly unsatisfactory explanations of the district court's ends-of-justice determinations," 596 F.3d at 406, the "sequence of events" leading up to the continuance "followed by the court's later explanation" sufficed to support an ends-of-justice continuance, *id.* at 405-06. Specifically, the record in *Napadow* reflected that the defendant's counsel had requested more time to prepare for trial and that government counsel had requested more time to coordinate certain witnesses' schedules. The court had then granted the continuance with a perfunctory minute entry referencing an "excludable delay in the interest of justice." *Id.* at 400. The court later recalled that it had "probably" excluded the time to ensure continuity of counsel and because it was the first date the attorneys were available. *Id.* at 405. In concluding that the sequence of events coupled with the later explanation sufficed, we noted that "[w]hen facts have been presented to the court and the court has acted on them, it is not necessary to articulate those same facts in a continuance order." *Id.* (internal quotations and citation omitted).

The record of the two hearings in question coupled with the district court's written denial of Wasson's motions to dismiss certainly satisfy this standard. The February continuance, recall, was requested by Wasson.

Wasson's motion, joined by Wolgamot and by the government, spelled out for the district court precisely why the ends of justice supported a continuance: (1) the complexity of the case (a matter which had already been agreed to by both the court and the parties); (2) the extensive discovery; and (3) the death of one co-defendant (Starns) and the addition of another (Wolgamot). Counsel represented that given the state of discovery he could not be prepared to adequately represent Wasson without a continuance. Faced with this motion and the parties' unanimous position that more time was needed to prepare for trial, the court's granting of the motion with its unadorned conclusion that the ends of justice were satisfied lets us know the court considered the § 3161(h)(7)(A) factors. In its ruling on Wasson's motion to dismiss, the court elaborated, noting that Wasson had requested several of the continuances and that in each instance it had made findings supporting its conclusion that the ends of justice outweighed the best interests of the defendant and the public in a speedy trial. Although it may have been better for the district court to spell out its agreement with Wasson's motion when granting it, the fact that Wasson's motion laid out the reasons supporting the continuance and the court subsequently granted the motion satisfies us the court considered the appropriate factors. *Napadow*, 596 F.3d at 405; *United States v. Pakala*, 568 F.3d 47, 60 (1st Cir. 2009) (rejecting defendant's challenges to Speedy Trial Act continuances where defendant moved for continuances and it was "clearly obvious" the district court adopted the grounds given in the motion).

Likewise, the colloquy on August 22, 2008 provides ample evidence that the court considered and balanced the ends of justice against the competing interests in a speedy trial. When the government explained the impact of Wolgamot's plea on its case, the court specifically inquired whether the plea changed the complexity of the case or simply the length of trial. The court verified that the case remained complex on account of the many taxpayer witnesses and the complexity of the trusts, and also asked Wasson's counsel if he continued to believe the case was complex. And the district judge learned that Wolgamot's plea would likely lead to additional discovery in terms of a proffer statement. Notably, Wasson's counsel then explained to the court that because of the discovery and Wolgamot's plea, which he represented "profoundly affect[ed]" Wasson's case, "[i]t would be very difficult for us to go to trial in just a few weeks." Given the many issues (including another "minor but key witness" for the government contemplating a guilty plea), the court expressed its understanding as to why Wasson was "about ready to come before the Court" himself to request a continuance. The court then assured itself that if the case were set in March, neither party anticipated requesting another continuance. Finally, the court asked Wasson directly if he had any objection to the motion to continue, stating that it "just wanted to make sure that you understand that the Court was willing to listen to your situation." Wasson stated that if his attorney—who had essentially joined the government's motion at this point—had no objection, neither did he. The court then sum-

marized the changing landscape of the case and noted that if the defense had moved to continue, it would have been "compelled" to grant the defense motion. This extensive colloquy more than satisfies us that the court balanced the factors and that the time between August 22 and the trial's commencement was excludable.

Wasson suggests that the court simply relied on its previous finding of complexity, but as the synopsis above makes clear, the court assured itself not only that the case remained complex, but that the complexity and the changing nature of the case warranted the continuance. *See* 18 U.S.C. § 3161(h)(7)(B)(ii). The court also took into account Wasson's need to prepare adequately for trial, *id.* § 3161(h)(7)(B)(iv), and the continuity of government counsel, *id.* And it is apparent that the court balanced the interest of the public, *id.* § 3161(h)(7)(A), when it assured itself that this would be the final continuance in the already long-delayed case (prompting government counsel's hyperbolic promise that nothing short of his "death" would prompt another continuance). With this background, the court's finding on the docket sheet that the ends of justice supported the continuance suffices, particularly when taken together with its later written explanation when ruling on Wasson's motion to dismiss. And although the court commented on the weather in January and February, it is clear from the colloquy above that the weather was not the basis for the continuance. *See Hills*, 618 F.3d at 629 (noting that court's comment about its time and schedule did not detract from primary reasons for ends-of-justice finding).

Because we are satisfied with the court's findings under § 3161, we need not reach the government's argument that because Wasson either requested or agreed to each continuance he is estopped from challenging them on appeal. We note, however, that Wasson's stance in the district court is at the very least inconsistent with his later challenges to the continuances. Although Wasson claims in his reply brief that *Zedner* precludes the government from making an argument based on judicial estoppel, that is not so. *Zedner* simply concluded that judicial estoppel did not apply when, among other reasons, the district court, not the defendant, had proposed that the defendant prospectively waive his rights under the Speedy Trial Act. *Zedner*, 547 U.S. at 505. Indeed, the court in *Zedner* noted that "[t]his would be a different case if petitioner had succeeded in persuading the District Court . . . that the factual predicate for a statutorily authorized exclusion of delay could be established." *Id.* As the detailed description above makes clear, Wasson *did* in fact succeed in persuading the district court that the factual predicates for an ends-of-justice continuance existed. Unlike the defendant in *Zedner*, of the two continuances in question, Wasson requested one and essentially joined the government in requesting the second. We thus reject Wasson's suggestion that estoppel would not apply here simply because he made a timely motion to dismiss under the Act. *See Pakala*, 568 F.3d at 60 (concluding that judicial estoppel barred defendant's Speedy Trial Act argument when he moved for continuances in question and "each time asserted statutorily authorized exclusions of delay"); *cf.*

*United States v. Larson*, 417 F.3d 741, 746 (7th Cir. 2005) (noting that defendant pressing Speedy Trial Act claim was "hardly in a position to complain about the delay because he was the one who asked for it"); *United States v. Baskin-Bey*, 45 F.3d 200, 204 (7th Cir. 1995) (pointing out that it was "unfair" for defendant "to ask that the trial be delayed to suit her, implicitly agree to the government's request that time be excluded because of her request, and then try to sandbag the government by insisting that the time be counted against the speedy trial clock"). So although we reserve judgment on the question of when estoppel prevents a plaintiff from challenging continuances under the Act, we note that Wasson's support for the continuances certainly does little to enhance his position on appeal. Finally, we are hard-pressed in any event to see how Wasson was prejudiced by the continuances. "Prejudice is caused by delays intended to hamper defendant's ability to present his defense," *Larson*, 417 F.3d at 746 (citation and internal quotations omitted), and the delays here had the opposite effect: they ensured Wasson and his counsel adequate time to deal with the complex and voluminous discovery and to adjust his defense in light of Starns's death and Wolgamot's plea.

Wasson next argues that there was insufficient evidence to sustain his convictions for conspiring to defraud the IRS or aiding in the filing of false tax returns. We review challenges to the sufficiency of the evidence at a bench trial under the same demanding standard applied to a jury trial. *United States v. Doody*, 600 F.3d 752, 754 (7th Cir. 2010). Thus, we will overturn the verdict only if

we conclude, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.* We neither reweigh the evidence nor assess witness credibility, and may uphold even a verdict based entirely on circumstantial evidence. *United States v. Kruse*, 606 F.3d 404, 408 (7th Cir. 2010).

To prove that Wasson violated 18 U.S.C. § 371 by conspiring to defraud the IRS, the government must demonstrate "(1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, *i.e.*, to defraud the United States." *United States v. Furkin*, 119 F.3d 1276, 1279 (7th Cir. 1997) (citation and internal quotations omitted). The government's obligation to prove "intent to defraud" refers to evidence showing the defendant knew of his tax liability, not that he knew "of the criminality of the objective." *Id. (*quoting *United States v. Cyprian*, 23 F.3d 1189, 1201 (7th Cir. 1994)). As relevant here, a conviction for aiding in the filing of a false tax return under 18 U.S.C. § 7206(2) requires proof that the defendant *willfully* assisted in the preparation of a false or fraudulent tax return. *See United States v. Powell*, 576 F.3d 482, 495 (7th Cir. 2009).

Wasson continues to press his claim that he sincerely believed in the legality of the Aegis system, and thus the government failed to prove that he willfully violated the tax laws. To prove willfulness in a criminal tax case, the government must show that "the law imposed a duty

on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). Making this showing requires the government to negate "a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws." *Id.* at 202.

Wasson would have us reweigh the evidence on appeal and credit his assertions that because multiple individuals involved in the marketing and promoting of the Aegis system vouched for its legality, he subjectively believed it to be so. But in contrast to the testimony of Aegis promoters and participants who believed it to be legal, the government presented ample evidence to support the district court's finding that Wasson had no such good-faith belief in the trust system. Most damning is Wasson's use of the so-called "audit arsenal" to respond to IRS inquiries and requests for audits directed to Aegis participants. As several individuals who purchased and used the Aegis system testified, after using the system to vastly reduce their tax liability, they received letters from the IRS requesting a meeting and informing them that they were being audited. In each instance, Wasson instructed these individuals not to respond to the communications from the IRS. Instead, Wasson sent the IRS a series of letters, signed by his clients, refusing to acknowledge the authority of the IRS, disavowing control or authority over the trust assets (which were at all times accessible to these individuals), questioning the "jurisdiction" of

the IRS, threatening the IRS agents with lawsuits if they pursued audits, and falsely denying United States citizenship.

Take, for example, Everett Alan Bugg, who had worked as a bank president and acquired $400,000 to $500,000 of stock in that position. Wasson marketed the trust to Bugg as a means whereby he could sell his stock and avoid tax liability by wiping out the gains on the sale. After Bugg set up three trusts using the Aegis system, he sold his bank stock for an approximately $500,000 gain but reported a loss on his income taxes for that year. Predictably, he received an audit letter from the IRS for that tax year. Bugg testified that Wasson told him to ignore the audit letter and tell the IRS that he was not willing to cooperate. Wasson also told Bugg that he had the right to "protect" himself by not "incriminating" himself. This response to the audit request is not consistent with a good-faith belief that the Aegis trusts and the tax returns utilizing them were lawful.

Other Aegis users testified to similar experiences with requests for audits and Wasson's urging them to use the "audit arsenal" to respond. Brian Scott Brooks, who owned a Dairy Queen and essentially eliminated his entire tax liability in 1997 and 1998 with claimed contributions of nearly $100,000 to charity, also received audit requests from the IRS. He testified that after Wasson advised him to avoid the IRS, he eventually decided to work with the IRS and correct his past returns and pay any back taxes and penalties. At that point Wasson advised Brooks to "be careful" getting out

of the Aegis system. He also responded very negatively to Brooks's intention to cooperate, telling Brooks that he could "provide problems to others" using the Aegis system who were being advised by Wasson not to cooperate with the IRS.

We cannot square Wasson's avoidance of the IRS with his stated belief that the Aegis trusts were legal. Wolgamot testified as follows when asked how he perceived his codefendants' use of the audit letters: "I thought they were nuts, that they should be—if they thought this system was legal, they should get a lawyer and go to court and have a judge tell them whether it's legal or not and not be fighting with these stupid audit arsenal letters." Indeed, if Wasson did actually think the system was legal, it strains reason to believe that instead of cooperating with the IRS, he would encourage clients to challenge its authority and avoid it at all costs—particularly when this ill-conceived advice resulted in his former clients ultimately paying hundreds of thousands of dollars in back taxes and penalties. This evidence certainly supports the district court's conclusion that Wasson did not in fact subjectively believe in the legality of the trust system.

The court also heard evidence that Wasson was on notice that the trusts were not legitimate. In 1999, Wasson showed Wolgamot a document from the IRS entitled "New Tax Snake Oil—Abusive Trusts." This document set forth what Wasson certainly should have known by then—that if a tax-free trust system seemed too good to be true, it probably was. Wasson also received

a copy of a letter from Merrill Lynch that alerted him to the likelihood that the Aegis trusts were not lawful. David Kindred, an obstetrician/gynecologist who had purchased Aegis trusts, received a letter from Merrill Lynch in response to an inquiry about setting up a trust. The letter stated that Merrill Lynch could not set up the requested trusts because such trusts could be used to illegally shelter assets from the IRS and the trusts were the subject of an ongoing IRS investigation. Wasson faxed the letter to Mike Vallone with the subject heading: "Merrill Lynch account for Dr. Kindred." Wolgamot also testified that in 1999 Wasson faxed him a copy of an article discussing an IRS revenue ruling describing trusts similar to the Aegis trusts and identifying them as illegal sham transactions. Given Wasson's awareness from multiple sources that the trust system or systems like it were considered abusive and illegal by the IRS, the district court had ample evidence to discredit his claim that he subjectively believed what he was doing was legal.

The trial evidence to the contrary does not undercut the sufficiency of the evidence. Wasson points out that Aegis officials repeatedly assured him that the trusts were legal. He also makes much of his own unwavering position to clients that the Aegis system was lawful and legitimate. But as the trier of fact, the district court was free to infer from the extensive evidence to the contrary that Wasson did not in fact have a subjective good-faith belief in the legality of the system. We are in no position to second-guess that decision, nor does the evidence Wasson presents "compel" us to conclude

the evidence fell short of demonstrating willful violations of the tax laws. Indeed, the evidence of Wasson's good-faith belief in the system amounts primarily to generalized assertions about the system's legality with the very people with whom he conspired to violate the tax laws. We are thus satisfied that the evidence was sufficient to prove both the conspiracy charge and the charges for assisting in the filing of a false income tax return.

Lastly, Wasson renews his claim that by sentencing him under the 2008 sentencing guidelines rather than those in effect when he committed his crimes, the district court violated the ex post facto clause of the Constitution. Under U.S.S.G. § 2T4.1(K), the 2008 guidelines caused Wasson's offense level to increase by four levels. Wasson acknowledges our holding in *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006), that the advisory nature of the guidelines eliminates any ex post facto problem with changes that retroactively increase the sentencing range for a crime. Although he urges us to reconsider our holding and reminds us that ours is a minority view among the circuits, *see, e.g.*, *United States v. Wetherald*, 636 F.3d 1315, 1321 (11th Cir. 2011); *United States v. Lanham*, 617 F.3d 873, 889-90 (6th Cir. 2010); *United States v. Ortiz*, 621 F.3d 82, 86-87 (2d Cir. 2010), he offers nothing new to convince us that we should change course on this issue now, *see, e.g.*, *United States v. Peugh*, 675 F.3d 736, 741 (7th Cir. 2012) ("We . . . stand by *Demaree's* reasoning . . . and again decline the invitation to overrule it."); *United States v. Sandoval*, 668 F.3d 865, 870 (7th Cir. 2011) (same).

## III.

For the foregoing reasons, we AFFIRM Wasson's convictions and sentence in all respects.